CRANDON ET AL. *v.* UNITED STATES

No. 88–931.   Argued November 6, 1989—Decided February 27, 1990*

---

*Together with No. 88–938, *Boeing Co., Inc.* v. *United States,* also on certiorari to the same court.

STEVENS, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and BRENNAN, WHITE, MARSHALL, and BLACKMUN, JJ., joined. SCALIA, J., filed an opinion concurring in the judgment, in which O'CONNOR and KENNEDY, JJ., joined, *post*, p. 168.

*Philip A. Lacovara* argued the cause for petitioners in No. 88–931. With him on the briefs were *William R. Stein, Gerard F. Treanor, Jr., Robert Plotkin,* and *E. Lawrence Barcella. Benjamin S. Sharp* argued the cause for petitioner in No. 88–938. With him on the briefs were *Hilary Harp, Robert S. Bennett,* and *Alan Kriegel.*

*Edwin S. Kneedler* argued the cause for the United States. With him on the brief were *Solicitor General Starr, Acting Assistant Attorney General Schiffer, Deputy Solicitor General Wallace, Michael F. Hertz,* and *Douglas Letter.*

JUSTICE STEVENS delivered the opinion of the Court.

In 1981 and 1982, five executives of The Boeing Company, Inc. (Boeing), resigned or took early retirement to accept important positions in the Executive Branch of the Federal Government. Upon termination of employment by Boeing, and shortly before formation of an employment relationship with the Government, Boeing made a lump-sum payment to each in an amount that was intended to mitigate the substantial financial loss each employee expected to suffer by reason of his change in employment. The question we must decide is whether these payments violated a provision of the Criminal Code that prohibits private parties from paying, and Government employees from receiving, supplemental compensation for the employee's Government service.[1]

The essential facts are not disputed. Each employee resigned because he planned to accept a specific federal position. These shifts required forgoing the higher salaries that each employee would have earned at Boeing and also

---

[1] "Salary of Government officials and employees payable only by United States

"(a) Whoever receives any salary, or any contribution to or supplementation of salary, as compensation for his services as an officer or employee of the executive branch of the United States Government, of any independent agency of the United States, or of the District of Columbia, from any source other than the Government of the United States, except as may be contributed out of the treasury of any State, county, or municipality; or

"Whoever, whether an individual, partnership, association, corporation, or other organization pays, or makes any contribution to, or in any way supplements the salary of, any such officer or employee under circumstances which would make its receipt a violation of this subsection—

"Shall be fined not more than $5,000 or imprisoned not more than one year, or both." 18 U. S. C. § 209(a) (enacted as Act of Oct. 23, 1962, Pub. L. 87–849, § 1(a), 76 Stat. 1125).

severing all financial connection with the company. Thus, petitioner Paisley, who took early retirement to become Assistant Secretary of the Navy for Research, Engineering and Systems—an office that requires confirmation by the United States Senate—estimated that the financial cost to him of separating from Boeing would be approximately $825,000, including approximately $77,000 in lost stock options and $250,000 in lost retirement benefits.[2] Boeing's severance payment to Paisley amounted to $183,000.[3] The comparable estimate of petitioner Crandon, who resigned to become a computer scientist for the North Atlantic Treaty Organization, was $150,000; his severance payment was $40,000.[4] The other three individual petitioners' payments were higher than Crandon's but lower than Paisley's.[5] Boeing paid the five departing employees a total of $485,000.[6]

---

[2] Joint Stipulations of Uncontested Facts ¶ 41, App. 27.

[3] 845 F. 2d 476, 478 (CA4 1988).

[4] Joint Stipulations of Uncontested Facts ¶ 87, App. 33; 845 F. 2d, at 478.

[5] Petitioner Jones, who resigned to become Deputy Under Secretary of Defense for Strategic and Theater Nuclear Forces, requested $176,000 as the cost of severance and received $132,000. Petitioner Reynolds, who resigned to become a consultant and then Deputy Director of Space and Intelligence Policy, requested $195,000 and received $80,000. Petitioner Kitson, who took early retirement to become Deputy Assistant Secretary of the Navy for Command, Control, Communications and Intelligence, requested $180,000 and received $50,000. Joint Stipulations of Uncontested Facts ¶ 25, App. 26; id., ¶ 55, App. 29; id., ¶¶ 71–72, App. 31; 845 F. 2d, at 478. The employees submitted estimates to Boeing that included their expected reduction in salary and benefits and the value of accumulated, but unvested, company benefits. A separate payment, standard to all departing Boeing employees, cashed out the employees' interests in vested benefits. *Ibid.*

[6] Boeing's internal accounting procedure for calculating severance pay for employees departing for Government positions used four factors: (1) the loss of salary for the duration of anticipated Government employment, which was assumed to be the remainder of the Presidential term, or the period prior to the employee's 65th birthday, whichever was shorter; (2) the loss of Boeing's contributions to the employee's retirement plan; (3) re-

None of the five individual petitioners was a Government employee at the time he received his severance payment.[7] Moreover, each payment was made unconditionally. None of the employees promised to return to Boeing at a later date nor did Boeing make any commitment to rehire them. After entering Government service, none of the individual petitioners provided Boeing with any favored treatment or, indeed, participated in any source selection or procurement decision that affected Boeing. It is stipulated that all five were competent and faithful Government servants. Apart from the fact of the payments themselves, there is no charge in this case of any misconduct by any of the petitioners.

In 1986 the United States filed a civil complaint alleging that the payments had been made "to supplement each individual defendant's compensation as a federal employee" and that they "created a conflict of interest situation which induced the breach of the fiduciary duty of undivided loyalty [which] each individual defendant owed to the United States, as measured by 18 U. S. C. § 209 and/or the common law." App. 12. The complaint sought relief from Boeing in the aggregate amount of the payments made and the imposition of a constructive trust on the moneys received by each of the individual petitioners.

After a full trial, the District Court ruled against the Government on several alternative grounds. 653 F. Supp. 1381 (ED Va. 1987). First, it held that § 209(a) had not been vio-

---

location costs; and (4) a supplement to cover the difference between living costs in Seattle and in Washington, D.C. An alternative procedure considered the employee's salary and years of service at Boeing and the duration of anticipated Government employment. App. 281–283.

Boeing staff estimated payments for petitioners Kitson and Crandon using both procedures and for petitioners Jones, Paisley, and Reynolds using solely the first procedure. Each petitioner's anticipated length of Government service was thus a component of the calculation of his final payment. Final amounts were approved by Boeing's chief executive. 845 F. 2d, at 478.

[7] *Ibid.*

lated because the payments were made before the recipients had become Government employees and were not intended to compensate them for Government service. Second, it held that there was no violation of any fiduciary standard of conduct established by common-law principles of agency because the payments were disclosed to responsible Government officials and because they did not "tend to subvert the loyalty of the individual defendants to the United States government." *Id.*, at 1387. Finally, the District Court concluded that the payments "created neither the appearance of nor an actual conflict of interest," and that the Government had not been injured by the payments and was therefore not, in any event, entitled to recover damages. *Ibid.*

A divided panel of the Court of Appeals reversed. 845 F. 2d 476 (CA4 1988). It held that employment status at the time of payment is not an element of a § 209(a) violation and that the District Court's finding that the payments were not intended to be supplemental compensation for services as employees of the United States was clearly erroneous. *Id.*, at 480. It further held that the prophylactic character of the conflict of interest laws made it unnecessary for the Government to prove any actual injury and that the defendants' disclosure of the payments did not constitute a defense to an action for their recovery. It therefore concluded that both the individual defendants and Boeing were liable, "although double recovery by the government is not permitted." *Id.*, at 482.[8]

We granted certiorari to review the Court of Appeals' construction of this important statute. 490 U. S. 1003 (1989).

I

At the outset, we note that Congress has not created an express civil remedy for violations of § 209(a). The Govern-

[8] The Court of Appeals also held that the statute of limitations barred all of the Government's tort claims against Boeing, except Boeing's payment to Kitson. *Id.*, at 481–482.

ment does not, in so many words, argue that the enactment of the statute implicitly created a damages remedy. Rather, the Government begins with the common-law rule that an agent who secretly profits from a breach of a fiduciary obligation to his principal must disgorge his ill-gotten gains. It then replaces the common-law definition of fiduciary obligation with the stricter standard of § 209(a), arguing that because concealment of a payment is not an element of the statutory offense, disclosure of payments is no defense. Regardless of whether the Government's amalgamation of common-law and statutory concepts describes a tenable theory of recovery, it is at least clear that the Government must prove a violation of § 209(a) to prevail in these cases. We proceed therefore to consider whether § 209(a) applies to a severance payment that is made to encourage the payee to accept Government employment, but that is made before the payee becomes a Government employee.

In determining the meaning of the statute, we look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy. *K mart Corp.* v. *Cartier, Inc.*, 486 U. S. 281, 291 (1988); *Pilot Life Ins. Co.* v. *Dedeaux*, 481 U. S. 41, 51 (1987). Moreover, because the governing standard is set forth in a criminal statute, it is appropriate to apply the rule of lenity in resolving any ambiguity in the ambit of the statute's coverage. To the extent that the language or history of § 209 is uncertain, this "time-honored interpretive guideline" serves to ensure both that there is fair warning of the boundaries of criminal conduct and that legislatures, not courts, define criminal liability. *Liparota* v. *United States*, 471 U. S. 419, 427 (1985); see also *United States* v. *Bass*, 404 U. S. 336, 347–348 (1971).

## II

Section 209 is one of almost two dozen statutory provisions addressing bribery, graft, and conflicts of interest that were revised and compiled at Chapter 11 of the Criminal Code in

1962. 18 U. S. C. §§ 201–224. While some sections focus on bribes or compensation offered as a *quid pro quo* for Government acts, and apply to persons before and after commencing Government service, § 209 is a prophylactic rule that aims at the source of Government employees' compensation.[9]

Section 209(a) contains two prohibitions, neither of which directly specifies when a payment must be made or received. The first paragraph is directed to every person who "receives" any salary supplement "as compensation for his services as an officer or employee" of an executive agency of the Government. The second paragraph is directed to every person who "pays," or makes any contribution or supplement to the salary of, "any such officer or employee" under circumstances that would make the receipt of the contribution a violation of the subsection. A literal reading of the second paragraph—particularly the use of the term "any such officer or employee"—supports the conclusion that the payee must be a Government employee at the time the payment is made. Similarly, the paragraph's additional prohibitions on one who "makes any contribution to, or in any way supplements the salary of," also refer to "any such officer or employee." Indeed, since the prohibited conduct is merely the receipt or the payment of the salary supplement, it follows that a violation of § 209(a) either is, or is not, committed at the time the payment is made. Despite the awkward drafting of the paragraphs, they appear to be coextensive in their coverage of both sides of a single transaction. The text of § 209(a) thus indicates that employment status is an element of the offense.[10]

---

[9] See 18 U. S. C. § 201 ("Bribery of public officials and witnesses"); 18 U. S. C. § 203 ("Compensation to Members of Congress, officers, and others in matters affecting the Government"). Some preemployment payments—and the mere offering or seeking thereof—thus are criminal under the provisions of § 203.

[10] JUSTICE SCALIA's grammatical analysis, *post*, at 169–170, misses the point. It does not matter whether the payment is made *to* "any such offi-

The Court of Appeals rejected this reading of the statute for two reasons. First, it noted that prior to its codification as § 209(a) of the Criminal Code in 1962, the plain language of the predecessor statute at 18 U. S. C. § 1914 (1958 ed.) was unambiguously limited to whoever, "being a Government official or employee," received any salary.[11] The Court of Appeals inferred that the deletion of this phrase meant that the payment no longer need occur during federal employment, and thus preemployment payments could violate § 209(a). 845 F. 2d, at 480. Second, it felt that the public policy underlying "§ 209 and the conflict of interest laws in general also support a broad interpretation of its coverage." *Ibid.* Because construction of a criminal statute must be guided by the need for fair warning, it is rare that legislative history or statutory policies will support a construction of a statute broader than that clearly warranted by the text. In this case, each of these sources indicates that our reading of the statutory language is consistent with congressional intent.

## III

The predecessor of § 209(a) was enacted in 1917 as an amendment to the Bureau of Education's legislative appropriation and provided that "no Government official or employee shall receive any salary in connection with his services" from a non-Government source.[12] The phrase *"being a*

---

cer," or to supplement the salary *of* "any such officer." In either event, the recipient of the payment must be "any such officer."

[11] The first paragraph of § 1914 was:

"Whoever, being a Government official or employee, receives any salary in connection with his services as such an official or employee from any source other than the Government of the United States, except as may be contributed out of the treasury of any State, county, or municipality . . . ." 18 U. S. C. § 1914 (1958 ed.).

[12] The legislation arose from a desire to halt the Bureau of Education's practice of allowing private organizations, such as the Rockefeller Foundation and universities, to pay the real salaries of employees whom the Bureau would pay the nominal salary of one dollar a year. Decrying the "ac-

Government official or employee" did not appear until 1948, when the provision was transferred from 5 U. S. C. § 66 to 18 U. S. C. § 1914 in the reorganization of Title 18.[13]   As the Court of Appeals recognized, this wording of § 1914 unquestionably required a recipient of a payment to be a Government employee at the time the payment was made.   This

tivities that have been indulged in through the Bureau of Education by agencies which seem to me to be inimical to the education of the youth of this country," Senator Chamberlain of Oregon proposed the following addition to the fiscal year 1918 appropriations bill:

"That no part of the appropriations made for the Bureau of Education, whether for salaries or expenses or any other purpose connected therewith, shall be used in connection with any money contributed or tendered by the General Education Board or any corporate or other organization or individual in any way associated with it, either directly or indirectly, or contributed or tendered by any corporation or individual other than such as may be contributed by State, county, or municipal agencies; nor shall the Bureau of Education receive any moneys for salaries . . . ."   54 Cong. Rec. 2039 (1917).

The proviso that passed, although still located in the section addressing the Bureau of Education's appropriations, contained much broader language:

"[N]o Government official or employee shall receive any salary in connection with his services as such an official or employee from any source other than the Government of the United States, except as may be contributed out of the treasury of any State, county, or municipality, and no person, association, or corporation shall make any contribution to, or in any way supplement the salary of, any Government official or employee for the services performed by him for the Government of the United States . . . ." Act of Mar. 3, 1917, ch. 163, § 1, 39 Stat. 1106.

See *International R. Co.* v. *Davidson*, 257 U. S. 506, 515 (1922) (reading § 1 of the uncodified statute independently).   This language was codified in 1934 at 5 U. S. C. § 66 (1934 ed.).   For a legislative history, see Hearings on H. R. 1900 et al. before the Antitrust Subcommittee of the House Committee on the Judiciary, 86th Cong., 2d Sess., 738–740 (1960) (Memorandum for the Attorney General Re: Conflict of Interest Statutes (1956)).

[13] Act of June 25, 1948, ch. 645, § 1, 62 Stat. 793.   The Reviser's Note to the official Code explains three specific changes from the wording of 5 U. S. C. § 66, but does not mention this addition.   The change appears to be encompassed in the Reviser's conclusion that "[m]inor changes were made in phraseology."   18 U. S. C. § 1914 (1946 ed., Supp. IV).

reading neither changed the original scope of the statute nor engendered any controversy; in the entire period between 1917 and 1962, criticism focused instead on the vagueness of the reference to payments made "in connection with" the employee's service.[14] The fact that the legislative history of § 209(a) explains the narrowing consequence of the elimination of these words, but is silent on the reason for eliminating "being a Government official or employee," is inconsistent with the view that Congress intended the latter change to broaden the coverage of the section.[15] The Senate and House Judiciary Committees and the Attorney General all maintained that § 209(a) made no substantive change in the law. Rather, the deletion of "Government official or employee" and use of the phrase "officer or employee of the ex-

---

[14] See, e. g., H. R. Rep. No. 748, 87th Cong., 1st Sess., 13 (1961); Association of the Bar of the City of New York, Conflict of Interest and Federal Service 212–216 (1960).

[15] See S. Rep. No. 2213, 87th Cong., 2d Sess., 14 (1962); H. R. Rep. No. 748, supra, at 24–25. Attorney General Kennedy's summary Memorandum Regarding Conflict of Interest Provisions of Public Law 87–849, 28 Fed. Reg. 988 (1963), reported that subsection (a) "uses much of the language of the former 18 U. S. C. 1914 and does not vary from that statute in substance."

Deletion of the phrase "being a Government official or employee" had been suggested at least once before in a proposed amendment that the House Antitrust Subcommittee considered in 1958, but that did not pass. The Subcommittee staff had found the phrase did not clearly cover Members of Congress or the Judiciary, and had recommended that the section be revised to address "[w]hoever receives any salary, or any contribution to or supplementation of salary, for or in connection with his services as a Member of or Delegate to Congress or a Resident Commissioner, or an officer, agent, or employee of the United States in the executive, legislative, or judicial branch . . . ." House Committee on the Judiciary, Federal Conflict of Interest Legislation, 85th Cong., 2d Sess., 45, 61, 82 (Comm. Print 1958). Like § 209(a), this proposed amendment dropped the "being a Government official" clause and left the unqualified "[w]hoever receives" subject, yet its drafters did not contemplate any effect on persons not yet employed by the Government.

ecutive branch" seemed only to enhance clarity and consistency with the other new conflicts statutes.[16]

We attach greater significance to two other changes that Congress made when it revised the bribery and conflict laws in 1962. In § 201 it added language extending the prohibition against bribery of a public official to a "person who has been selected to be a public official," which it defined as "any person who has been nominated or appointed to be a public official, or has been officially informed he will be so nominated or appointed."[17] In § 203, which prohibits outside compensation for the performance of public service, Congress expressly covered advance requests or offers of compensation for services to be "rendered . . . at a time when [the recipient] is an officer or employee of the United States."[18] In both of these provisions Congress used unambiguous language to cover preemployment payments; the absence of comparable language in § 209(a) indicates that Congress did

---

[16] One purpose of the 1962 bill was to eliminate inconsistency and overlap in the conflicts provisions. Section 1914 was the only predecessor statute containing the phrase "Government official or employee." In the new §§ 207, 208, and 209, the 1962 bill replaced this phrase and the different terms previously used in §§ 281, 283, 284, and 434 with the uniform phrase "officer or employee of the executive branch of the United States Government, of any independent agency of the United States, or of the District of Columbia." H. R. Rep. No. 748, *supra*, at 41–45.

[17] Act of Oct. 23, 1962, Pub. L. 87–849, 1(a), 76 Stat. 1119. The phrase was "included in order to set forth the point at which a prospective public official comes within the statutory coverage." H. R. Rep. No. 748, *supra*, at 18.

[18] 76 Stat. 1121. The present statute is even more specific, covering services "rendered or to be rendered either personally or by another—(A) at a time when such person is a Member of Congress, Member of Congress Elect, Delegate, Delegate Elect, Resident Commissioner, or Resident Commissioner Elect; or (B) at a time when such person is an officer or employee of the United States in the executive, legislative, or judicial branch of the Government, or in any agency of the United States, including the District of Columbia." 18 U. S. C. § 203(a)(1).

not intend to broaden the pre-existing coverage of that provision.

Further evidence confirming that § 209(a) requires employment status at the time of payment is found in subsections (b) and (c) of § 209.[19]  The former expressly authorizes federal employees to continue to receive payments from a bona fide pension, health, or other benefit plan maintained by a former employer, and the latter makes § 209 inapplicable to certain types of Government employees.  Both of the provisions obviously focus on payments that are made while the recipient is a Government employee.  The addition of these two exemptions in 1962, like the careful draftsmanship of §§ 201 and 203, is consistent with Attorney General Kennedy's contemporaneous opinion that § 209(a) did not change the substance of the former 18 U. S. C. § 1914.  See n. 14, *supra.*

## IV

Congress appropriately enacts prophylactic rules that are intended to prevent even the appearance of wrongdoing and that may apply to conduct that has caused no actual injury to the United States.  Section 209(a) is such a rule.  Legislation designed to prohibit and to avoid potential conflicts of interest in the performance of governmental service is supported by the legitimate interest in maintaining the public's

---

[19] Those subsections provide:

"(b) Nothing herein prevents an officer or employee of the executive branch of the United States Government, or of any independent agency of the United States, or of the District of Columbia, from continuing to participate in a bona fide pension, retirement, group life, health or accident insurance, profit-sharing, stock bonus, or other employee welfare or benefit plan maintained by a former employer.

"(c) This section does not apply to a special Government employee or to an officer or employee of the Government serving without compensation, whether or not he is a special Government employee, or to any person paying, contributing to, or supplementing his salary as such."  18 U. S. C. §§ 209(b), (c).

confidence in the integrity of the federal service.[20]    Neither good faith, nor full disclosure, nor exemplary performance of public office will excuse the making or receipt of a prohibited payment.    It is nevertheless appropriate, in a case that raises questions about the scope of the prohibition, to identify the specific policies that the provision serves as well as those that counsel against reading it too broadly.    See *Offshore Logistics, Inc.* v. *Tallentire*, 477 U. S. 207 (1986).

A special committee on the federal conflict of interest laws of the Association of the Bar of the City of New York prepared a scholarly report in 1960 that the Government and the petitioners agree accurately describes the policies implemented by § 209(a).    The report stated:

> "The rule is really a special case of the general injunction against serving two masters.    Three basic concerns underlie this rule prohibiting two payrolls and two paymasters for the same employee on the same job.    First, the outside payor has a hold on the employee deriving from his ability to cut off one of the employee's economic lifelines.    Second, the employee may tend to favor his outside payor even though no direct pressure is put on him to do so.    And, third, because of these real risks, the arrangement has a generally unwholesome appearance that breeds suspicion and bitterness among fellow employees and other observers.    The public interpretation is apt to be that if an outside party is paying a government employee and is not paying him for past services, he must be paying him for some current services to the payor during a time when his services are supposed to be devoted to the government."    Association of the

---

[20] Conflict of interest legislation is "directed at an evil which endangers the very fabric of a democratic society, for a democracy is effective only if the people have faith in those who govern, and that faith is bound to be shattered when high officials and their appointees engage in activities which arouse suspicions of malfeasance and corruption." *United States* v. *Mississippi Valley Generating Co.*, 364 U. S. 520, 562 (1961).

Bar of the City of New York, Conflict of Interest and Federal Service 211 (1960).

It is noteworthy that this report characterized the relevant rule as one "prohibiting two payrolls and two paymasters for the same employee on the same job." At least two of the three policy justifications for the rule—the concern that the private paymaster will have an economic hold over the employee and the concern about bitterness among fellow employees—apply to ongoing payments but have little or no application to an unconditional preemployment severance payment. Of course, the concern that the employee might tend to favor his former employer would be enhanced by a generous payment, but the absence of any ongoing relationship may mitigate that concern, particularly if other rules disqualify the employee from participating in any matter involving a former employer. Thus, although the policy justifications for § 209(a) are not wholly inapplicable to unconditional preemployment severance payments, they by no means are as directly implicated as they are in the cases of ongoing salary supplements.

An important countervailing consideration also cannot be ignored. As President Kennedy recognized in 1961 when he sent his message to Congress calling for a wholesale revision of the conflict of interest laws:

"Such regulation, while setting the highest moral standards, must not impair the ability of the Government to recruit personnel of the highest quality and capacity. Today's Government needs men and women with a broad range of experience, knowledge, and ability. It needs increasing numbers of people with top-flight executive talent. It needs hundreds of occasional and intermittent consultants and part-time experts to help deal with problems of increasing complexity and technical difficulty. In short, we need to draw upon America's entire reservoir of talent and skill to help con-

duct our generation's most important business — the public business." Message from the President of the United States Relative to Ethical Conduct in the Government, H. R. Doc. No. 145, 87th Cong., 1st Sess., 2 (1961).

The President described some of the statutes that were then on the books as wholly inadequate, while others "create[d] wholly unnecessary obstacles to recruiting qualified people for Government service." *Id.*, at 3.

Attorney General Kennedy commented on this same concern in his memorandum on the 1962 legislation. After explaining that one of the "main purposes of the new legislation" was "to help the Government obtain the temporary or intermittent services of persons with special knowledge and skills whose principal employment is outside the Government," he predicted that the new legislation would "lead to a significant expansion of the pool of talent on which the departments and agencies can draw for their special needs."[21] The substantive additions of §§ 209(b) and 209(c) to allow continuing participation in pension and benefits plans and to exempt certain employees from the prohibitions of § 209(a) is wholly consistent with the Attorney General's outlook. In contrast, an expansion of § 209(a) to encompass preemployment payments would run counter to this interest.[22]

The severance payments made to the petitioners in this case have a somewhat nebulous character. On the one hand, as the Government correctly argues, they give rise to a possible appearance of impropriety that is certainly one of the con-

---

[21] Office of the Attorney General, Memorandum Regarding Conflict of Interest Provisions of Public Law 87–849, 28 Fed. Reg. 985 (1963).

[22] The reach of § 1914 had long been recognized as "a serious obstacle to recruitment of men for government office at an age when they are apt to be most vigorous and productive." Association of the Bar of the City of New York, Conflict of Interest and Federal Service 158 (1960). See also Hearings on H. R. 1900 et al., *supra*, n. 12, at 750 (Memorandum for the Attorney General Re: Conflict of Interest Statutes (1956)) ("It appears that the only significant problem respecting section 1914 is whether it discourages recruitment of executives from private industry").

cerns of § 209(a). On the other hand, allowing corporations to encourage qualified employees to make their special skills available to the Government serves the public interest identified by both the President and the Attorney General when § 209(a) was enacted. It is not our function to express either approval or disapproval of this kind of unconditional severance payment. We note only that a literal reading of the statute—which places a pre-Government service severance payment outside of the coverage of § 209(a)—is consistent with one of the policies that motivated the enactment of the statute. Because the language Congress used in § 209(a) is thus in "harmony with what is thought to be the spirit and purpose of the act," this case presents none of the "rare and exceptional circumstances" that may justify a departure from statutory language. *Crooks* v. *Harrelson*, 282 U. S. 55, 59–60 (1930); accord, *Rubin* v. *United States*, 449 U. S. 424, 430 (1981).

Finally, as we have already observed, we are construing a criminal statute and are therefore bound to consider application of the rule of lenity. To the extent that any ambiguity over the temporal scope of § 209(a) remains, it should be resolved in the petitioners' favor unless and until Congress plainly states that we have misconstrued its intent.

The judgment of the Court of Appeals is accordingly reversed.

*It is so ordered.*

JUSTICE SCALIA, with whom JUSTICE O'CONNOR and JUSTICE KENNEDY join, concurring in the judgment.

I agree with the Court that the Government has failed to prove that any of the petitioners violated 18 U. S. C. § 209 (a), and that its claim to a common-law remedy premised upon such a violation accordingly must fail. My reasons, however, are somewhat different. I do not think that payments which are made before or after the term of federal employment are necessarily excluded from § 209(a); but I do think that payments which are neither made periodically dur-

ing the term of federal service, nor calculated with reference to periodic compensation, are excluded.

## I

Subsection (a) of § 209 makes criminally liable:

"Whoever receives any salary, or any contribution to or supplementation of salary, as compensation for his services as an officer or employee of the executive branch of the United States Government . . . from any source other than the Government of the United States[; and]

"Whoever . . . pays, or makes any contribution to, or in any way supplements the salary of, any such officer or employee under circumstances which would make its receipt a violation of this subsection . . . ."

I agree with the Court that these two clauses are "coextensive in their coverage of both sides of a single transaction," *ante*, at 159, so that if the phrase "such officer or employee" in the second clause implies a requirement that the payment be made *while* the recipient was an officer or employee, such a requirement must have been meant in the first clause as well. Surely, however, the evidence of such an implication should be fairly clear before one concludes that Congress has slipped in an additional requirement in such an unusual fashion, importing it retroactively into the earlier clause from a provision that is otherwise only the mirror image of what preceded. To my mind the evidence is not only not fairly clear; it is nonexistent. The Court is led astray, I think, by its perception that the statute "is directed to every person who 'pays' . . . 'any such officer or employee,'" *ibid.* — which leads to the reasonable enough contention that unless the recipient is an officer or employee at the time of payment the provision is not violated. But in order to make "any such officer or employee" the object of the verb "pays," the clause must be rendered ungrammatical, reading "[w]hoever pays . . . any such officer or employee under circumstances which

would make its receipt a violation of this subsection." The pronoun "its" has no antecedent (or more precisely, I suppose, the phrase "under circumstances which would make its receipt a violation of this subsection" has no application to "[w]hoever pays"). It seems to me quite clear that the object of "pays" must be, not "any such officer or employee," but rather *"the salary of,* any such officer or employee," so that the later phrase "its receipt" refers to the receipt of the salary. Substance as well as grammar dictates this result, because only in this fashion does the second clause of subsection (a) achieve the apparent purpose of mirroring the first. The first clause does not apply to "whoever receives any payment, or any contribution to or supplementation of salary," but rather to "[w]hoever receives any *salary,* or any contribution to or supplementation of salary." One would therefore expect the second clause to cover whoever *pays* any salary, or any contribution to or supplementation of salary. I acknowledge that this interpretation of the second clause means that the comma after the phrase "the salary of" should instead have been placed after the word "supplements." But a misplaced comma is more plausible than a gross grammatical error, plus the destruction of an apparently intended parallelism, both leading to the peculiar introduction of a condition in the second clause which one would surely have expected to find in the first.

The Court apparently concedes that when the first clause of subsection (a) refers to someone who "receives any salary, or any contribution to or supplementation of salary, as compensation for . . . services as an officer or employee of the executive branch of the United States," it does not imply that the recipient must be an officer or employee at the time of receipt. There is no *more* reason to think that the second clause imports such a requirement when it refers to someone who "pays, or makes any contribution to, or in any way supplements, the salary of any such officer or employee." Perhaps it is not possible to pay an officer when he is not an offi-

cer; but it is surely possible to pay, to contribute to, or to supplement *the salary of an officer* (just as it is possible to receive payment, contribution to, or supplementation of such salary) either before or after the service to which the salary pertains has been completed.

For a different reason, unaddressed by the Court, I agree that the payment in the present case is not covered by § 209(a).

## II

It is an ancient and sound rule of construction that each word in a statute should, if possible, be given effect. An interpretation that needlessly renders some words superfluous is suspect. In seeking to hold the present petitioners liable, the Government treats § 209(a) as though it read "[w]hoever receives compensation for his services as an officer or employee of the executive branch of the United States Government . . . from any source other than the Government of the United States." But it does not read that way. Another of the ethics statutes, 18 U. S. C. § 203, *does* read that way, covering the receipt or payment of "any compensation" for services as a Government employee relating to a particular matter. Subsection 209(a), however, does not refer to "whoever receives compensation," but to "whoever receives *any salary, or any contribution to or supplementation of salary, as* compensation." The second clause, as we have seen, is likewise entirely tied to *salary*. It would be bad construction to ignore this language (if it can be given reasonable meaning) in the interpretation of any statute; but it is particularly bad construction to ignore it in a criminal statute, where the rule of lenity applies. See *Adamo Wrecking Co. v. United States*, 434 U. S. 275, 284–285 (1978).

Salary is not the same as compensation, but is one species of that genus. It is "[t]he recompense or consideration paid, or stipulated to be paid, to a person *at regular intervals* for services . . . ; fixed compensation *regularly paid*, as by the year, quarter, month, or week." Webster's Second New In-

ternational Dictionary 2203 (1957) (emphasis added). See also *Benedict* v. *United States*, 176 U. S. 357, 360 (1900) ("The word 'salary' may be defined generally as a fixed annual or periodical payment for services, depending upon the time and not upon the amount of services rendered"). To "receive salary as compensation" is to receive periodic payments as compensation. And in the context of the present statute it must reasonably be thought that to "receive contribution to or supplementation of salary as compensation" is to receive contribution to or supplementation of periodic payments, in the sense that the contribution or supplementation itself must be periodic. To read it differently—to regard any single payment from a nongovernment source as a "contribution to or supplementation of salary"—is to render all the references to salary superfluous, so that the statute might as well have prohibited (like § 203) all "compensation." [1] It is significant that when the Office of Personnel Management sought to embody the substance of § 209(a) in its ethics regulations, in a fashion that would be understood to mean what the Government thinks it means, it revised the references to contribution and supplementation of salary, as follows:

---

[1] Under such an interpretation, the one possible effect of the "salary" language would be to allow an unsalaried Government officer or employee to receive a lump-sum payment for his services from a private source. That would result because the lump-sum payment would not be a "salary," nor could it be a "contribution to or supplementation of salary," since no salary exists to be supplemented or contributed to. But even that effect (strangely contrived as it is) is largely if not completely eliminated by subsection (c), which entirely excludes from the section's coverage special Government employees, as defined in 18 U. S. C. § 202, and uncompensated Government officers and employees. The only class that remains as a possible recipient of lump-sum payments so obscurely validated by the otherwise pointless "salary" language consists of Government officers and employees who are not special employees and who are compensated in some manner other than by payment of salary. I am not aware that such a class exists.

> "An employee shall not receive any salary or anything of monetary value from a private source as compensation for his services to the Government (18 U. S. C. 209)." 5 CFR § 735.203(b) (1989).

Under the original version of § 209(a), enacted in 1917, it was even clearer that "contribution to" or "supplementation of" salary envisioned regular, salary-like payments. That read in relevant part as follows:

> "[N]o Government official or employee shall receive any salary in connection with his services as such an official or employee from any source other than the Government of the United States, . . . and no person, association, or corporation shall make any contribution to, or in any way supplement the salary of, any Government official or employee for the services performed by him for Government of the United States." Act of Mar. 3, 1917, 39 Stat. 1106.

Even when Congress amended the provision in 1948, it left the structure substantially the same, making criminally liable:

> "Whoever, being a Government official or employee, receives any salary in connection with his services as such an official or employee from any source other than the Government of the United States, . . . or

> "Whoever, whether a person, association, or corporation, makes any contribution to, or in any way supplements the salary of, any Government official or employee for the services performed by him for the Government of the United States . . . ." 62 Stat. 793.

In each of these versions, if one interpreted the phrase "make(s) any contribution to, or in any way supplement(s) the salary of" to include not only periodic payments but also lump-sum payments, then the prohibitions upon payor and payee would not match: the Government official who received a lump-sum payment would be guiltless (since he did not "re-

ceive any salary") whereas the payor would be criminally liable. This obviously was not intended. At both ends, *salary* was the object of the prohibition. The Government does not rely upon any change in the meaning of the statute effected by the 1962 revision and recodification, but to the contrary acknowledges—indeed boasts—that its position was "firmly established" under the earlier versions. Nor would it be appropriate to regard the 1962 legislation as congressional approval and ratification of the prior interpretation. That would in any circumstance be a doubtful basis for disregarding the text of a criminal statute, but is particularly unjustified when, as I shall discuss in Part III below, the interpretation in question was not that of the courts or of an agency that had primary responsibility for administering the law, and was full of inconsistencies to boot.

I must acknowledge that subsections (d) and (e) of § 209 exclude from the coverage of subsection (a) some payments that are not periodic payments, so that the interpretation I have described is no more successful than the Government's in giving effect to all the language of the section. But superfluous exceptions (to "make assurance doubly sure") are a more common phenomenon than the insertion of utterly pointless language at the very center of the substantive restriction. Moreover, since (as I shall discuss in Part III below) the Government is not so foolish as to apply literally its interpretation that all lump-sum payments as compensation are covered, subsections (d) and (e) turn out to be largely superfluous under its view of the statute as well. See May 31, 1961, Memorandum of Office of Legal Counsel (OLC) (advising that the proposed subsection (d) would be "a clarification of existing law" rather than "an exemption" from 18 U. S. C. § 1914 (1958 ed.)); 33 Op. Atty. Gen. 273 (1922); 42 Op. Atty. Gen. 111, 125 (1962). In any case, granting that the only reasonable *implication* of subsections (d) and (e) is that subsection (a) applies to payments in addition to periodic payments, it remains true that the only reasonable *meaning* of subsection

(a) itself is that it applies exclusively to periodic payments. Even if one does not think that a meaning trumps an implication, at most we have an ambiguity—and since this is a criminal statute the rule of lenity demands that it be resolved in favor of the more narrow criminal liability.

It may seem strange nowadays that Congress should think of categorically criminalizing only periodic payments (salary or supplementation of salary), rather than all payments, to Government employees. But it would not have seemed strange in 1917, when the substance of subsection (a) was originally enacted. There existed at that time, in apparently more than one Government agency, a regular practice of hiring, at nominal salary, individuals whose real compensation would be paid by private organizations. 54 Cong. Rec. 2039–2047, 4011–4013; B. Manning, Federal Conflict of Interest Law 148–149 (1964). Cf. 31 Op. Atty. Gen. 470 (1919); 2 Comp. Gen. 775 (1923). Apart from the fact that Congress often acts only "one step at a time" to eliminate one abuse that has become the focus of its attention but not all allied abuses, there are good practical reasons why the payment or supplementation of salary would have been singled out. Surely receipt of a regular salary from a private source poses the *greatest* risk of corruption; one commonly characterizes the corrupt official by saying that "he is on someone's payroll." Moreover, the payment or supplementation of salary can be categorically eliminated (as lump-sum payments cannot) without criminalizing a large number of harmless, perfectly innocent, and often desirable, arrangements. For example: It is rare, I think, for well-to-do parents to make periodic, salary-like payments to their child so that he might continue in a low-paying Government job that they are proud of his performing and wish him to continue. I suspect it is not at all rare, however, for such parents to make occasional gifts to the child, or to leave a particularly generous bequest, with precisely that end in mind. Under the interpretation of § 209 adopted by the Government, each such act of generos-

ity, if rendered and accepted with that objective, would seemingly violate the law. That alone, I should think, would be reason enough not to criminalize all "supplementation of salary" in the sense the Government would have us understand the term.

## III

I must address at some length what seems to me the strongest argument against interpreting § 209(a) to mean what it says: the fact that it has long been interpreted differently. On analysis, that proves to be a weaker consideration than one might suppose. Indeed, the long and unsatisfactory experience with a countertextual interpretation is one of the prime reasons for adhering to what Congress enacted.

Two points must be made clear at the outset: First, the substantial history of interpretation that exists is not a history of *judicial* interpretation. In the more than 70 years that § 209 and its predecessors have been in existence, this Court has discussed them, in passing, only three times, see *Muschany* v. *United States,* 324 U. S. 49, 67 (1945); *United States* v. *Myers,* 320 U. S. 561, 567 (1944); *International R. Co.* v. *Davidson,* 257 U. S. 506, 515 (1922). Prior to the present litigation, the Courts of Appeals have discussed them only three times, see *United States* v. *Oberhardt,* 887 F. 2d 790, 793–794 (CA7 1989); *United States* v. *Raborn,* 575 F. 2d 688, 691–692 (CA9 1978); *United States* v. *Muntain,* 198 U. S. App. D. C. 22, 27–28, 610 F. 2d 964, 969–970 (1979), and the District Courts only four times, see *United States* v. *Pezzello,* 474 F. Supp. 462, 463 (ND Tex. 1979); *Exchange National Bank of Chicago* v. *Abramson,* 295 F. Supp. 87, 89–91 (Minn. 1969); *United States* v. *Gerdel,* 103 F. Supp. 635, 638–639 (ED Mo. 1952); *United States* v. *Morse,* 292 F. 273, 276–277 (SDNY 1922). Only one of these scarce judicial references, a 1952 District Court opinion, explicitly discusses the issue of salary *versus* lump-sum payment, agreeing with the Government's position here; that discussion, moreover, was by its own admission "gratuitous,"

since the statute was in no way at issue. See *Gerdel, supra*, at 638. And in only two of these cases — one from a District Court, one from a Court of Appeals, and both relatively recent — was the (unchallenged) assumption that lump-sum payments were covered apparently necessary to the court's holding. See *United States* v. *Oberhardt, supra; United States* v. *Pezzello, supra.* In sum, the Government's position is not supported by a long, or even appreciable, body of judicial interpretation.

Second, the vast body of *administrative* interpretation that exists — innumerable advisory opinions not only of the Attorney General, the OLC, and the Office of Government Ethics, but also of the Comptroller General and the general counsels for various agencies — is not an administrative interpretation that is entitled to deference under *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984). The law in question, a criminal statute, is not administered by any agency but by the courts. It is entirely reasonable and understandable that federal officials should make available to their employees legal advice regarding its interpretation; and in a general way all agencies of the Government must interpret it in order to assure that the behavior of their employees is lawful—just as they must interpret innumerable other civil and criminal provisions in order to operate lawfully; but that is not the sort of specific responsibility for administering the law that triggers *Chevron.* The Justice Department, of course, has a very specific responsibility to determine for itself what this statute means, in order to decide when to prosecute; but we have never thought that the interpretation of those charged with prosecuting criminal statutes is entitled to deference.

Besides being unentitled to what might be called ex officio deference under *Chevron*, this expansive administrative interpretation of § 209(a) is not even deserving of any persuasive effect. Any responsible lawyer advising on whether particular conduct violates a criminal statute will obviously

err in the direction of inclusion rather than exclusion—assuming, to be on the safe side, that the statute may cover more than is entirely apparent. That tendency is reinforced when the advice-giver is the Justice Department, which knows that if it takes an erroneously narrow view of what it can prosecute the error will likely never be corrected, whereas an erroneously broad view will be corrected by the courts when prosecutions are brought. Thus, to give persuasive effect to the Government's expansive advice-giving interpretation of § 209(a) would turn the normal construction of criminal statutes upside-down, replacing the doctrine of lenity with a doctrine of severity.

The body of administrative interpretation is nonetheless useful in the present case, for one purpose: It demonstrates beyond question the unmanageable problems that arise when § 209(a) is *not* interpreted as it was written, limited to the payment or supplementation of salary. The administrative history of § 209(a) is a record of poignant attempts by the Attorney General and the OLC to derive reasonable results from the rigid and undiscriminating criminal statute they have invented. To follow their logic is to glimpse behind the looking glass.

An example is employee receipt of cash awards from nonprofit organizations for meritorious public service. Unless one believes that the statutory term "as compensation" (or its predecessor term "in connection with") imports the common-law requirement of bargained-for consideration—which no one contends—it is difficult to imagine any lump-sum payments more clearly covered by § 209(a) than cash grants conferred specifically to reward the work of Government officials. But the Justice Department has approved them. The first OLC opinion doing so, rendered on June 26, 1959, exemplifies the benign if unpredictable discretion that has guided the administrative interpretation of this criminal statute. The opinion quotes a 1922 Attorney General's opinion to make the obvious point that the "'object of the provision . . .

was that no Government official or employee shall serve two masters to the prejudice of his unbiased devotion to the interests of the United States.'" June 26, 1959, Memorandum of OLC 4 (quoting 33 Op. Atty.. Gen., at 275). It then continues: "When such a conflict has not been present, the statute has been liberally construed not to apply in situations in which, strictly construed, it might have been held to be applicable but in which there appeared to be no violation of the spirit of the statute." June 26, 1959, Memorandum, at 4. It is of course absurd to interpret a *criminal statute* on the basis of one's perception as to whether its "spirit" has been violated; and doubly absurd to interpret a *prophylactic measure* on the basis of whether the evil against which the prophylaxis was directed in fact exists. The OLC opinion also finds that the award in the subject case is "not based upon the 'master-servant' relationship between the payor and the payee which usually attends or may be expected to attend application of the statute," *id.*, at 5—a principle which, as far as I can tell, has no basis in law and which the Government assuredly does not apply to the statute in other contexts. On the basis of such reasoning, and because "[i]n short, a conflict of interest such as the legislative history of the statute indicates that it was designed to prevent would not be created," *ibid.*, the opinion approves receipt of the Rockefeller Public Service Awards, established under a grant from John D. Rockefeller III.[2]

---

[2] The OLC opinion notes, but apparently misses the delicious irony in, the fact that the sponsor of the original version of § 209(a) "objected particularly to the employment of persons whose actual salary was paid by the Rockefeller and Carnegie Foundations." June 26, 1959, Memorandum of OLC 3.

It is interesting to note that three years before this OLC opinion the Comptroller General had given the advice that receipt of the Rockefeller Public Service Awards *would* violate § 1914. 36 Comp. Gen. 155 (1956). At that time the grants were not lump-sum cash gifts, but continuing grants for tuition, travel, and living expenses at educational facilities. It

Later OLC opinions and memoranda continue this essentially catch-as-catch-can approach to public-service awards, unified mostly by the extraordinary principle that this criminal statute is violated if and when its purposes seem to be offended. "[A]n award of this kind is so far removed from the purposes of the statutory prohibition as not to be covered by it." July 31, 1974, Memorandum of OLC 1.

> "[Title] 18 U. S. C. § 209(a) prohibits only those payments made or received with the intent that they reward past government services or compensate for future ones. . . . Intent is to be inferred from the circumstances, particularly the past and prospective connection between the .employee and the payor and the ability of the employee to benefit the payor in the performance of his official duties.
>
> "This office has advised that [the Rockefeller Public Service Awards] were not prohibited by the statute because they were not intended to and did not in fact give rise to the sort of dual loyalty which it was designed to prevent. The same would appear to be true here. [The payor] is a non-profit educational institution. The . . . Prize is a one-time-only payment, based on your achievements before you entered the government. While no one factor is determinative, it is our opinion, based on our understanding of the situation, that your receipt of the award is not prohibited by 18 U. S. C. § 209(a)." April 7, 1977, Memorandum of OLC 2–3.

There would certainly be no objection to this "we'll-look-at-all-the-circumstances-and-see-if-it-looks-dangerous" approach if it were applied in the exercise of the President's discretion-laden power to "prescribe regulations for the conduct of employees in the executive branch," 5 U. S. C. § 7301. But it is an unprecedented way of interpreting the criminal law.

---

is hard to see why, on the Government's theory, that should have made any difference.

There are many other areas besides "meritorious public-service awards" in which the unworkability of the Government's interpretation has led to what can charitably be called convoluted reasoning. I will mention only two. In 1922 the Attorney General opined that it would not violate the predecessor of § 209(a) for an employee of the Department of Commerce, dispatched on official business for a speech before a business organization, to accept from that organization reimbursement of the travel expenses and hotel bills that he would otherwise have to bear personally. The extent of the reasoning was as follows:

> "Where, as in the arrangement proposed to you, the officer or employee concerned does not personally benefit by the payments from outside sources, any more than he would if he paid his own traveling expenses, the statute is not violated. Literally there may be said to be a 'contribution to' the officer or employee for services performed by him for the Government, but in reality the contribution is to the Government itself, and is in furtherance, not prejudice, of its interests." 33 Op. Atty. Gen., at 275.

Of course the same could have been said of the private payment of the salaries of federal employees that was prevalent in 1917, see *supra*, at 175, so long as the amounts were no more than necessary to induce the employees to continue in their federal jobs, and (in combination with their federal salary) no more than they could have earned elsewhere.

Finally, I may mention the 1940 opinion from Attorney General Robert Jackson to President Roosevelt, advising that the predecessor of § 209(a) did not prohibit universities from granting leave with pay to faculty members serving as consultants to the Government—not as part of a regular sabbatical program, but only to enable the rendering of consulting services to the United States during the wartime emergency. That opinion is genuinely devoid of analysis, unless one gives that name to the *ipse dixit* that "[t]he payments in

such circumstances are made with respect to the former employment and incidental to the leave granted; they are not made 'in connection with' the services of the individual as an official or employee of the United States within the contemplation of the statute." 39 Op. Atty. Gen. 501, 503. I mention that opinion because it demonstrates that the "spirit-of-the-matter" approach to § 209(a), necessitated by the interpretation that expands it beyond its language, ultimately (and quite predictably) will affect even the *proper* applications of the statute. The consultants with salaries paid by universities in 1940 were almost the precise equivalent of the employees with salaries paid by foundations in 1917.[3]

As the last example shows, the liberties that the Government has taken with its interpretation of § 209(a), to the extent they appeal to anything more concrete than the "spirit" of the statute, rely upon the phrase "as compensation for" (or its predecessor, "in connection with"). The proper interpretation of § 209(a) will not eliminate that troublesome phrase, but it will eliminate most of the temptation to give it something other than a clear and constant meaning. If § 209(a) covers only the payment of salary, there would be little difficulty in following the principle that the statute is violated when the reason for paying the salary is, in whole or in part, the recipient's status as, or work that the recipient has performed or will perform as, a federal officer or employee. But one balks at applying such a clear principle to, for example, the reimbursement of transportation and lodging for a

---

[3] While I have limited my discussion in text to Justice Department opinions, those of the Comptroller General are no more rational. Consider, for example, the following:

"Donations of cash to employees by private sources are, therefore, prohibited, even though the money is to be used to purchase transportation tickets or hotel accommodations. However, where the services are furnished in kind, we believe a different conclusion is justifiable." 36 Comp. Gen. 268, 270 (1956).

federal employee who gives a speech, see 33 Op. Atty. Gen. 273 (1922), meritorious public-service awards, see Memorandum of June 26, 1959, reduced-price registration fees for federal employees at American Bar Association meetings, reduced-price entertainment tickets for members of the armed services, or many other situations one can envision. Until a criminal statute reasonable enough to be accorded a clear interpretation can be enacted, lump-sum payments that do not consist of bribes (which are already covered by 18 U. S. C. § 201) or of compensation for services *in a particular matter* (which are already covered by 18 U. S. C. § 203) are better handled by administrative prohibition, through Executive Order under the President's authority and pursuant to 5 U. S. C. § 7301, see Exec. Order No. 11222, 3 CFR 306 (1964–1965 Comp.), and by agency regulations adopted under delegation of that authority. Operating in that manner, the Executive can make, and can experiment with, all sorts of reasonable distinctions that § 209(a), if interpreted to cover lump-sum payments, cannot honestly be said to permit — according special treatment, for example, to privately paid compensation that consists of cash reimbursement for travel and subsistence expenses, see 3 CFR § 100.735–15(d)(1) (1989), and to compensation that consists of awards, but only if conferred by a nonprofit organization, see 3 CFR § 100.735–15(d)(3) (1989); 5 CFR § 735.203(e)(3) (1989).

## IV

I come, finally, to applying § 209(a) as I think it must be interpreted to the facts of the present case: The payments to all the recipients here were in lump sums. Perhaps there is room for argument that they would nonetheless fall within the statute if their existence and their amounts were strictly tied to a period of federal service—that is, if they had been computed on the basis of so much per month or so much per year that each recipient promised to serve. But even this argument is eliminated by the District Court's finding that

"[t]he severance payments . . . were not contingent upon the individuals *[sic]* entering into federal government service, [or] their remaining in government service for any stated period of time . . . ."   653 F. Supp. 1381, 1384 (ED Va. 1987). There is, in short, no basis for holding that what transpired here was the receipt of "salary, or any contribution to or supplementation of salary" within the meaning of § 209(a).   I therefore agree with the Court that the judgment of the Court of Appeals must be reversed.