WATERMAN, Justice
(dissenting).
I respectfully dissent because I conclude Ryan Nicoletto, the defendant basketball coach paid under a contract with the school district, was a “school employee” prohibited by Iowa Code section 709.15 (2009) from having sex with a student on his team. I would affirm his conviction. As the district court correctly stated, “To construe Section 709.15, The Code, to exclude a coach in a public school district would be contrary to the intent of the statute, and common sense.” The majority’s hypertechnical interpretation reaching the opposite conclusion opens a gaping loophole in that law, enacted to protect students from sexual exploitation by adults at their school. Today’s decision no doubt will surprise school officials, parents, and coaches who had assumed the same law that made it illegal for a teacher to engage in sexual activity with students also applied to coaches. The ball is now in the legislature’s court to amend section 709.15 to close this new loophole.
The majority’s interpretation of section 709.15 fails to apply a fundamental rule of interpretation: “[Statutes are to be read so they make sense and achieve the legislature’s purposes.” State v. DeSimone, 839 N.W.2d 660, 667 (Iowa 2013). The legislature’s purpose in enacting section 709.15 was to criminalize the exploitation of students by school employees in a power relationship over their victims. State v. Romer, 832 N.W.2d 169, 177-78 (Iowa 2013) (“[W]e have emphasized that it *433 is exploitation of the power relationship that must be avoided”)- Our court of appeals in Romer aptly observed, “Our legislature could well have concluded that a school employee has a higher calling or duty than an ordinary citizen to protect school-age children.” State v. Romer, No. 11-0270, 2012 WL 3590725, at *4 (Iowa Ct.App. Aug.22, 2012) (unpublished opinion), aff'd, 832 N.W.2d 169 (Iowa 2013). Most parents would agree. I do.
Iowa legislators presumably understood there is a risk of sexual exploitation of student athletes by coaches that warrants at least the same statutory prohibitions that are applied to teachers and other school employees. I see no persuasive indication the legislature intended to exclude coaches from section 709.15.[2] Coaches, even more than classroom teachers, are in a power relationship over students, and those few who lack impulse control are well-positioned to take advantage. As the district court aptly concluded, “The statute prohibits adults in schools from abusing their position of trust and authority with students, for the purpose of gratifying their sexual desires. Certainly, the intent of the statute is to reach and include individuals in Nicoletto’s position.” Exactly right.
Anyone with experience in youth sports understands that student athletes generally are more vulnerable to exploitation by coaches than by classroom teachers or other school employees. The coach decides who makes the team, who plays, and who sits on the bench. College scholarship opportunities may hang in the balance. Practices are after school hours. Games are at night with travel to other towns. Tension and emotional drama are inevitable. For obvious reasons, the training required to attain and renew coaching authorizations includes conduct advisories to avoid impropriety and the appearance of impropriety. See generally Iowa Admin. Code r. 282-22.1(2)(a )(5) (requiring five hours of coursework “relating to the knowledge and understanding of professional ethics and legal responsibilities of coaches” to earn coaching authorization). Nicoletto serves as an example of what can happen. Commentators agree:
The sad truth is that sports provide the perfect opportunity for adults to sexually exploit children. Coaches are placed on a pedestal by parents and children. They work closely with youngsters, often away from other adults. In some cases they travel out of town together, often staying overnight. Parents have assumed that their child will be protected because there are other children around. Clearly this is not a guarantee.
Robert J. Shoop, Sexual Exploitation in Schools: How to Spot It and Stop It 32 (2004).
Children in a coach-player relationship tend to be more susceptible to sexual assault for various reasons. Whenev *434 er there exists a parenting or nurturing environment, children are much more likely to consent to activities they usually would never undertake. Children look to coaches as role models, heroes, or even best friends; therefore, athletes almost always automatically trust them. Furthermore, from the earliest stages of athletics, children are taught to never argue with or disobey coaches.
Jamie Peterson, “Don’t Trust Me with Your Child”: Non-Legal Precautions When the Law Cannot Prevent Sexual Exploitation in Youth Sports, 5 Tex. Rev. Entm’t & Sports L. 297, 299 (2004) (footnotes omitted).
The majority plays a linguistic shell game to get to its result. The majority concludes, erroneously, that a “coaching authorization” is not a “license” and a coach is not a “licensed professional.” A “coaching authorization” is simply a form of “license.” I disagree with the majority’s conclusion that a paid sports coach is not a “professional.” Common definitions of “professional” plainly include trained coaches paid to do their job. We use the word “professional” to distinguish a paid employee from a volunteer or amateur. See Webster’s Seventh New Collegiate Dictionary 680 (1972) (defining “professional” as “participating for gain or livelihood in an activity or field of endeavor often engaged in by amateurs”; “engaged in by people receiving financial return”; “one that engages in a pursuit or activity professionally”); Webster’s Third New International Dictionary 1811 (unabr. ed.2002) (defining “professional” as “one with sufficient authority or practical experience in an area of knowledge or endeavor to resemble a professional”). You can hire a professional painter to touch up your living room ceiling or do it yourself. The painter does not need a doctorate to be a professional. There is no contextual indication the legislature intended a narrow definition for “licensed professional” in section 709.15 limited to the learned professions requiring advanced degrees. I would affirm the rulings by two district court judges[3] that Coach Nicoletto was a “licensed professional” within the meaning of section 709.15.
The majority’s effort to distinguish a “coaching authorization” from a “license” is unpersuasive. Iowa Code section 709.15(l)(f) defines “school employee” to mean “a practitioner as defined in section 272.1,” which in turn defines “practitioner” as follows:
“Practitioner” means an administrator, teacher, or other licensed professional, including an individual who holds a statement of professional recognition, who provides educational assistance to students.
Iowa Code § 272.1(7) (emphasis omitted). The fighting issue in this case is whether a coach is a “licensed professional.” Section 272.1 defines “license” as follows:
“License” means the authority that is given to allow a person to legally serve as a practitioner, a school, an institution, or a course of study to legally offer professional development programs, other than those programs offered by practitioner preparation schools, institutions, courses of study, or area education agencies. A license is the exclusive authority to perform these functions.
Iowa Code § 272.1(5) (emphasis omitted).
Separately, a person who does not have a teaching license must obtain a *435 “coaching authorization” to serve as a paid coach in an Iowa public school. See Iowa Admin. Code r. 282 — 22.1 (“A coaching authorization allows an individual to coach any sport in a middle school, junior high school, or high school.”); see also Iowa Admin. Code r. 282 — 18.28(29)(6) (stating requirements to receive an “Athletic coach” teaching endorsement). As the district court recognized, that coaching authorization is what authorizes the coach to serve as a coach — which equates to a license. A coaching authorization is simply a form of a license. Many coaches have a teaching license. Under the majority’s interpretation, section 709.15 criminalizes a paid coach’s sexual activity with a student if the coach has a teaching license, but not if, like Nicoletto, the coach has only the coaching authorization. That makes no sense.
Significantly, the legislature treats authorizations the same as licenses throughout chapter 272, so why treat them any differently in this context? For example, Iowa Code section 272.2(1)(6) (2018) charges the board with “[p]rovid[ing] annually to any person who holds a license, certificate, authorization, or statement of recognition issued by the board, training relating to the knowledge and understanding of the board’s code of professional conduct and ethics.” Iowa Code section 232.69(1)(6 )(4) (2009) lists both licensed school employees and holders of coaching authorizations as mandatory reporters of child abuse. Iowa Code section 272.15(l)(a )(2) (2013) requires school officials to report disciplinary action against “a person who holds a license, certificate, or authorization issued by the board” for the same conduct.
As the majority acknowledges, coaches like Nicoletto are mandatory reporters of child abuse, including improper sexual contact. Iowa Code § 232.69(1)(6)(4) (2009). Yet, now, under the majority’s interpretation of section 709.15, Nicoletto may lawfully have consensual sex with sixteen-year-old girls[4] he coaches — conduct that would land their classroom teacher in prison. He would be legally obligated to report a teacher who did what he did, but not himself. This is absurd. The majority thereby disregards yet another rule Iowa courts are to follow: “We seek to ‘avoid strained, impractical, or absurd results’ in interpreting statutes.” Rivera v. Woodward Res. Ctr., 830 N.W.2d 724, 733 (Iowa 2013).
I would not give a pass to Coach Nicoletto, who at the time of his misconduct at issue was thirty years old, with a college degree and a decade of coaching experience. He is fourteen years older than his victim. He began having sex with the victim when she was age sixteen, a junior in high school, and playing on the girls’ varsity basketball team he was paid to coach. She became enamored with her coach during the varsity season and initiated their relationship through text messages that hinted she “liked him.” He balked at first, texting back that “it sounded dangerous and he wasn’t sure he could trust [her].” She responded that she “was very trustworthy and he could trust” her. Their texts escalated into sexual banter. He invited her to his house in March of 2008, late in the basketball season. She *436 went there alone, unsure what would happen. By April, they were having sex, and she was spending nights at his home, telling her parents that she was staying at a Mend’s house. The relationship extended into the summer, as Nicoletto continued to coach the basketball team in off-season scrimmages and practices. Their clandestine sexual liaison continued into the fall semester and spanned two basketball seasons. Nicoletto has never claimed he believed Iowa law permitted him to sleep with a girl he coached.
Nicoletto obviously had “fair warning” that sleeping with a student was wrong— he acknowledged as much and went to great lengths to keep his relationship with the victim secret. See Crandon v. United States, 494 U.S. 152, 160, 110 S.Ct. 997, 1002, 108 L.Ed.2d 132, 141 (1990) (“[Construction of a criminal statute must be guided by the need for fair warning.... ”).[5] He told her never to phone him because he did not want her number on his phone bills. Yet, they exchanged thousands of text messages, ninety-one in one day. He warned her never to tell anyone about their relationship. He got very angry when she told a friend. Nicoletto told the victim that his family “would disown him” if they knew what he was doing. He ended their relationship only because a suspicious principal began asking them both questions. He had sex with the victim the morning he ended their relationship. When Nicoletto later tearfully confessed to his adult girlMend, he asked if she “thought he was a pedophile.” After the relationship ended, Nicoletto “wouldn’t even look at [the victim] at practice.” When confronted by her mother and later the police, the victim initially denied any relationship with Nicoletto and later came clean. She testified at his jury trial. The jury found him guilty.
For those reasons, I would affirm the district court’s rulings that Nicoletto’s misconduct is criminal under Iowa Code section 709.15.
MANSFIELD, J., joins this dissent.

. The majority notes two proposed bills were introduced in 2003 that would have expressly named coaches as "school employees” subject to criminal liability for sexual exploitation. Instead of enacting either of these stand-alone bills, the general assembly adopted wide-ranging school legislation that, in one section, extended criminal liability to all "school employees” who are "licensed professionals.” This legislative history is inconclusive. See Iowa Dental Ass’n v. Iowa Ins. Div., 831 N.W.2d 138, 146 n. 3 (Iowa 2013) (concluding "[i]t is difficult to draw definitive conclusions from ... legislative history” when multiple versions of a bill are in play). One could infer that the general assembly intended the final legislation to have the same coverage as the stand-alone bills. One could further infer that the legislature assumed it was unnecessary to name coaches in the final legislation because they were easily included under the definition of "licensed professional."

. The first district court judge denied Nicolet-to's motion to dismiss in a thorough, well-reasoned ruling filed July 6, 2012, that carefully addressed the interrelated statutory provisions in concluding a coach is a licensed professional subject to the criminal prohibitions of Iowa Code section 709.15. Another judge presided over the trial and reached the same conclusion in a separate, well-reasoned ruling on Nicoletto's posttrial motions.

. It is a separate crime, commonly known as statutory rape, for an adult to have sex with a fourteen or fifteen year old if the adult is four or more years older than the minor. Iowa Code Ann. § 709.4(l)(fc )(3)(d) (West, Westlaw current through immediately effective legislation signed as of April 4, 2014) (with exception for those cohabitating at the time as husband and wife); see also id. § 709.4(l)(fc )(2) (criminalizing sex act with child age thirteen or younger by any person not cohabitating at the time as husband and wife); id. § 709.3(1) (b) (criminalizing sex act with person under the age of twelve).

. The majority understandably does not rely on the rule of lenity. See United States v. Castleman, - U.S. -, 134 S.Ct. 1405, 1416, 188 L.Ed.2d 426 (2014) (citing Crandon and noting “ 'the rule of lenity only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute, such that the Court must simply guess as to what Congress intended’ ” (quoting Barber v. Thomas, 560 U.S. 474, 488, 130 S.Ct. 2499, 2508, 177 L.Ed.2d 1, 12 (2010))). But see State v. Copenhaver, 844 N.W.2d 442, 453 n. 4, 2014 WL 1128320, at *8 n. 4 (Iowa 2014) (Mansfield, J., dissenting) (questioning whether the rule of lenity in Iowa is limited "to situations where there was grievous ambiguity in a statute and no [other] basis for choosing among plausible interpretations of a statute" (internal quotation marks omitted)).