# Application of 18 U.S.C. § 209 to Employee-Inventors Who Receive Outside Royalty Payments

A federal government employee who obtains patent rights to an invention made in the course of federal employment ordinarily does not violate 18 U S.C. § 209 by licensing the patent rights to a private entity and receiving royalty payments in exchange

September 7, 2000

MEMORANDUM OPINION FOR THE DIRECTOR
OFFICE OF GOVERNMENT ETHICS

You have asked for our opinion whether a federal government employee who obtains patent rights to an invention made in the course of federal employment violates 18 U.S.C. § 209 by licensing the patent rights to a private entity and receiving royalty payments in exchange. *See* Letter for Randolph D. Moss, Acting Assistant Attorney General, Office of Legal Counsel, from Stephen D. Potts, Director, Office of Government Ethics (Oct. 19, 1999) ("Potts letter"). We conclude that § 209 ordinarily does not ban outside royalty payments to employee-inventors.

I.

Section 209(a) states:

> Whoever receives any salary, or any contribution to or supplementation of salary, as compensation for his services as an officer or employee of the executive branch of the United States Government, of any independent agency of the United States, or of the District of Columbia, from any source other than the Government of the United States, except as may be contributed out of the treasury of any State, county, or municipality; or
>
> Whoever, whether an individual, partnership, association, corporation, or other organization pays, or makes any contribution to, or in any way supplements the salary of, any such officer or employee under circumstances which would make its receipt a violation of this subsection shall be subject to the penalties set forth in section 216 of this title.

18 U.S.C. § 209(a) (1994). This provision, as the Court of Appeals for the Ninth Circuit has explained, bars "(1) an officer or employee of the executive branch or an independent agency of the United States government from (2) receiving

170

salary or any contribution to or supplementation of salary from (3) any source other than the United States (4) as compensation for services as an employee of the United States." *United States v. Raborn*, 575 F.2d 688, 691–92 (9th Cir. 1978). You have asked us to focus on the third and fourth elements, *see* Potts letter at 2, and we accordingly assume that the first two elements — that an employee-inventor is an "officer or employee of the executive branch" or an "independent agency," and that royalty payments constitute a "contribution to or supplementation of salary" — would be established here.

The government has the right to obtain the "entire right, title and interest in and to all inventions made by any Government employee (1) during working hours, or (2) with a contribution by the Government of facilities, equipment, materials, funds, or information, or of time or services of other Government employees on official duty, or (3) which bear a direct relation to or are made in consequence of the official duties of the inventor." Exec. Order No. 10096, 3 C.F.R. 292 (1949–1953 comp.). If an agency determines that the government's contribution to the employee's invention is "insufficient equitably to justify" the government's obtaining all rights to the invention, or that the agency has "insufficient interest" in the invention, it "shall leave title to such invention in the employee," subject to an irrevocable, nonexclusive license to the government. *Id.* We understand that employee-inventors who are allowed to retain patent rights in their inventions often enter into licensing agreements with private entities, under which they receive royalty payments. *See* Potts letter at 1. In some instances, an employee-inventor may continue to develop the invention as part of his or her job responsibilities and may participate in a cooperative research and development agreement ("CRADA") between the agency and a private entity. *See id.*

## II.

You have suggested that the third element of a § 209 violation — receipt of payment *from a source other than the United States* — might not be satisfied here because the government could be deemed the source of outside royalty payments to employee-inventors. *See* Potts letter at 2–3; *see also* 18 U.S.C. § 209(a) (forbidding salary supplementation "from any source other than the Government of the United States"). We do not believe that this argument can be sustained.

The closest analogue appears to be set out in an opinion of our Office from 1993. There, we considered the government's practice, under the Federal Technology Transfer Act ("FTTA"), 15 U.S.C. §§ 3701–3717 (1994 & Supp. IV 1998), of sharing with an employee-inventor the royalties that the government received from licensing the employee's invention. These payments to the employee, we concluded, did not place the employee in the position of violating 18 U.S.C. § 208, which generally forbids an employee from working on a par-

ticular matter in which he or she has a financial interest.[1] *See Ethics Issues Related to the Federal Technology Transfer Act of 1986*, 17 Op. O.L.C. 47, 50 (1993). The FTTA, as then written, required government agencies to "pay at least 15 percent of the royalties or other income the agency receives on account of any invention to the inventor . . . if the inventor . . . assigned his or her rights in the invention to the United States." 15 U.S.C. § 3710c(a)(1)(A)(i) (1994). Because the government paid the royalties at issue, we determined that they did not constitute an outside financial interest implicating § 208. *See* 17 Op. O.L.C. at 50–51.[2] Although the opinion primarily dealt with § 208, we also concluded, on the same reasoning, that employees receiving such payments would not violate § 209(a). *See id.* at 51.

Here, although private entities pay the royalties, employee-inventors acquire patent rights only because the government has decided not to exercise its right to obtain title. *See* Potts letter at 3. We agree, therefore, that the royalties come from the government in an indirect sense. Nonetheless, the royalties at issue in our 1993 opinion came *directly* from the government and *indirectly* from a private source; here the converse is true. *See* 17 Op. O.L.C. at 51 ("Since an employee receives section 7 payments from the federal agency holding the rights to the invention, the payments are not subject to § 209(a)'s prohibition."). Rather than incidentally benefitting by receiving a portion of the royalties from an agreement between the government and a private entity, employee-inventors in the present case are themselves entering into licensing agreements to which the government is not a party. The payments here are thus critically different from those addressed in our 1993 opinion. Here, the indirect connection between the government and the royalty payments cannot negate their direct connection to a nongovernmental source. Accordingly, we conclude that the third element of § 209 could be met, and we turn to the fourth element.

---

[1] Section 208(a) states.

> Except as permitted by subsection (b) hereof, whoever, being an officer or employee of the executive branch of the United States Government, or of any independent agency of the United States, a Federal Reserve bank director, officer, or employee, or an officer or employee of the District of Columbia, including a special Government employee, participates personally and substantially as a Government officer or employee, through decision, approval, disapproval, recommendation, the rendering of advice, investigation, or otherwise, in a judicial or other proceeding, application, request for a ruling or other determination, contract, claim, controversy, charge, accusation, arrest, or other particular matter in which, to his knowledge, he, his spouse, minor child, general partner, organization in which he is serving as officer, director, trustee, general partner or employee, or any person or organization with whom he is negotiating or has any arrangement concerning prospective employment, has a financial interest [s]hall be subject to [specified] penalties
> . . . .

18 U S C § 208(a) (1994)

[2] We reasoned that such payments would become part of the inventor's federal employment contract, would necessarily be known to the government, and therefore would not implicate the central concerns of § 208. *See id.*

III.

You have expressed the concern that outside royalty payments might be viewed as compensation "for the employee's past or present services to the Government in developing the invention." Potts letter at 6. We recognize that the statute might be given that interpretation. Nonetheless, we believe that, on the better view, the payments would not meet this element of the statute.

In a 1997 opinion, we interpreted § 209 to require an "intentional, direct link" between the outside compensation and the employee's government service. *Applicability of 18 U.S.C. § 209 to Acceptance by FBI Employees of Benefits Under the "Make a Dream Come True" Program*, 21 Op. O.L.C. 204, 206 (1997). We did not read § 209 to prohibit "all non-government payments to an individual where there is any nexus between the payment and the individual's employment by the government." *Id.* at 209. We largely relied on an amendment of the provision in 1962, by which Congress deleted the phrase "in connection with" from the earlier version and substituted the "as compensation for" language. Congress made this change because the former phrase was thought ambiguous and "capable of an infinitely broad interpretation." *Id.* at 206 (citing H.R. Rep. No. 87–748, at 13, 25 (1961)). "The amendment was designed to clarify that there must be a *direct link* between the contribution to or supplementation of salary and the employee's services to the government." *Id.* (emphasis added).

No intentional, direct link between an employee-inventor's government services and the licensing of patent rights would typically exist here. Our 1997 opinion identified several factors that should be taken into consideration when construing the "as compensation for" requirement of § 209, where the existence of an intentional, direct link is unclear. Those factors include:

> (1) whether there is a substantial relationship or pattern of dealings between the agency and the payor; (2) whether the employee is in a position to influence the government on behalf of the payor; (3) whether the expressed intent of the payor is to compensate for government service; (4) whether circumstances indicate that the payment was motivated by a desire other than to compensate the employee for her government service . . .; (5) whether payments would also be made to non-government employees; and (6) whether payments would be distributed on a basis unrelated to government service.

*Id.*

Three of these factors support the conclusion that outside royalty payments generally are not intended to be compensation for government services. It is unlikely that a payor would expressly indicate an intent "to compensate for government service." *Id.* (third factor). To the contrary, the circumstances typically would

indicate that the payor "was motivated by a desire other than to compensate the employee for her government service" *Id.* (fourth factor) — the desire to obtain property rights to an invention that it views as valuable. This value would not normally come from the fact that the employee-inventor developed his or her invention while working as a government employee. Presumably, a payor would be just as interested in acquiring rights to such an invention if the inventor were not a federal employee. Moreover, the payments "would be distributed on a basis unrelated to government service." *Id.* (sixth factor). They would not be calibrated to reflect the amount of government time the employee devoted to developing the invention but only to the value of the invention. In sum, these factors point to the conclusion that payors would not be compensating employee-inventors for government service, but instead would be motivated by the economic advantages of securing property rights to a potentially valuable invention. "This Department has consistently construed § 209(a) and its predecessor, 18 U.S.C. § 1914, to forbid *only* payments *intended to serve* as additional compensation to an individual for undertaking or performing government service." *See Gifts Received on Official Travel*, 8 Op. O.L.C. 143, 144 (1984) (citing 41 Op. Att'y Gen. 217, 221 (1955); 39 Op. Att'y Gen. 501, 503 (1940)) (emphasis added) (internal quotation marks omitted).

One other factor — "whether payments would also be made to non-government employees" — at the least would not point to the contrary conclusion. We have not been apprised of any situation in which a particular licensee has entered into licensing agreements only with government-employed inventors, or in which, in instances where patent rights are held jointly by a federal employee and another inventor who is not employed by the federal government, a licensee has paid a disproportionately large share of the royalties to the federal employee.

The two remaining factors set forth in our 1997 opinion — "whether there is a substantial relationship or pattern of dealings between the agency and the payor" and "whether the employee is in a position to influence the government on behalf of the payor," 21 Op. O.L.C. at 206 — may be applicable to some, though not all, licensing arrangements between a private entity and a government employee. Even in those circumstances in which these factors are present, however, we believe the independent prohibition in 18 U.S.C. § 208 should ensure that royalty payments are not made "as compensation for" the employee-inventor's government services. These two factors follow from the Supreme Court's explication of § 209 in *Crandon v. United States*, 494 U.S. 152, 158 (1990). The *Crandon* Court observed that § 209 was intended to prevent an outside payor from having a "hold on the employee deriving from his ability to cut off one of the employee's economic lifelines," and to address the tendency of an employee "to favor his outside payor even though no direct pressure is put on him to do so." *Id.* at

165 (quoting Association of the Bar of the City of New York, *Conflict of Interest and Federal Service* 211 (1960)) (internal quotation marks omitted).[3]

Where a private entity purchases the right to use a government employee's valuable patent rights and the employee does no further work relating to the patent, neither the "substantial relationship" nor the "position to influence" factors should typically apply. In such situations, therefore, royalty payments would not, absent unusual circumstances, constitute "compensation for" government services. According to your letter, however, in some cases, "employee[-inventor]s may continue to work, as part of their official duties, on certain aspects of the product or process for which they have been permitted to obtain certain patent rights. This additional work may include, among other things, technical improvements to the invention or research on new uses for the invention." Potts letter at 1; *see also* 17 Op. O.L.C. at 47 (discussing this practice). When the government and the payor are collaborating through a CRADA, there would likely be a "substantial relationship or pattern of dealings between the agency and the payor." 21 Op. O.L.C. at 206. Even when there is no CRADA, concerns may be raised if in developing or refining the invention the employee-inventor "is in a position to influence the government on behalf of the payor." *Id.*

Nevertheless, in the context of employee-inventors who receive outside royalty payments, these concerns are largely eliminated by the independent prohibition of § 208. *Cf. Crandon*, 494 U.S. at 166 (noting that "the [§ 209] concern that the employee might tend to favor his former employer" can be addressed by "other rules [that] disqualify the employee from participating in any matter involving a former employer"). Section 208 requires employee-inventors to recuse themselves from agency actions when they have a financial interest in a particular matter. Section 208 thus bars employee-inventors who receive outside royalty payments from continuing to participate in research concerning their inventions, including CRADAs. *See* 17 Op. O.L.C. at 53. This prohibition on participation in matters in which employee-inventors have financial interests prevents them from being "in a position to influence the government on behalf of the payor," even if "there is a substantial relationship or pattern of dealings between the agency and the payor." 21 Op. O.L.C. at 206.[4]

To be sure, § 208 may be waived "upon a written determination that the disqualifying interest of the employee is 'not so substantial as to be deemed likely to affect the integrity of the services which the government may expect' from the employee." *See Waiver of the Application of Conflict of Interest Laws for*

---

[3] The Court noted that § 209 is also aimed at preventing the "suspicion and bitterness among fellow employees and other observers" that can occur when employees are receiving compensation from outside sources *Id.*

[4] We do not address whether there could be facts under which an employee-inventor would have a financial interest under § 208 *before* licensing an invention However, although our 1993 opinion did not reach this issue, it noted that after the government decides not to take up foreign patent rights (but before the employee-inventor licenses those rights), the employee-inventor's possession of foreign patent rights "consitute[s] an integral part of the FTTA incentive program created by Congress" and "that § 208 can and should be interpreted as consistent with the provisions of the FTTA." 17 Op O L C. at 50, 53

*Members of the President's Commission on Strategic Forces*, 7 Op. O.L.C. 10, 12–13 (1983) (quoting 18 U.S.C. § 208(b)). Nevertheless, although that determination is left to the discretion of the official who appointed the employee, "[i]t is the responsibility of that official to exercise his considerable discretion soundly and in good faith, after a careful and thorough consideration of all of the pertinent facts." *Id.* at 14–15. In these circumstances, possible concerns about the divided loyalty of an employee are adequately addressed under § 208, including the standards for waivers. *See* 5 C.F.R. § 2640.301 (2000).

In view of § 208, a broad interpretation of § 209 would not advance any statutory purpose. *Cf.* Beth Nolan, *Public Interest, Private Income: Conflicts and Control Limits on the Outside Income of Government Officials*, 87 NW. U. L. Rev. 57, 80 (1992) ("The law prohibits not private gain per se, but rather prohibits private gain that impairs the integrity of services provided to the government, that creates the appearance of misuse of government office, or that requires others to pay to receive access to or services from the government."). Indeed, a ban on employee-inventors' receiving any royalties from their inventions might well run counter to congressional intent. As the *Crandon* Court recognized, § 209 was not intended to "impair the ability of the Government to recruit personnel of the highest quality and capacity." 494 U.S. at 166 (quoting Message from the President of the United States Relative to Ethical Conduct in the Government, H.R. Doc. No. 145, 87th Cong., 1st Sess. 2 (1961)). We understand that a ban on outside royalties could impede, perhaps severely, the government's ability to attract and retain talented employees in the relevant labor markets because it would increase the already considerable income gap between private and public sector employment. *See* Potts letter at 12 ("The application of section 209 to this situation would mean that employee-inventors would have to leave Government if they wanted to commercialize patents obtained under section 8" of the FTTA.); *cf. Crandon*, 494 U.S. at 167 n.22 ("The reach of [§ 209's predecessor] had long been recognized as a serious obstacle to recruitment of men for government office . . . .").

An overly broad interpretation of § 209 would also frustrate the purposes of the FTTA. Congress passed the FTTA to increase use of federally-developed technology by the private sector in order "to improve the economic, environmental, and social well-being of the United States." 15 U.S.C. § 3702. Congress expected employee-inventors to obtain and exploit patent rights to their inventions when the government opted not to retain its rights. *See* S. Rep. No. 99–283, at 14 (1986), *reprinted in* 1986 U.S.C.C.A.N. 3442, 3456. As we observed in our opinion interpreting § 208 and the FTTA, "[i]t is well settled that statutes must be construed as consistent if possible." 17 Op. O.L.C. at 50 (citing *Watt v. Alaska*, 451 U.S. 259, 266–67 (1981) and *Patterson v. McLean Credit Union*, 491 U.S. 164, 181 (1989)). "[A] specific policy embodied in a later federal statute should control our construction of the [earlier] statute, even though it ha[s] not been expressly

amended." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000) (quoting *United States v. Estate of Romani*, 523 U.S. 517, 530–31 (1998)); *see also Patterson*, 491 U.S. at 181 (stating that courts should hesitate to "read an earlier statute broadly where the result is to circumvent" a later-enacted statutory scheme). If § 209 were interpreted to prohibit employee-inventors from licensing their inventions to private entities, the exploitation of those inventions would languish because employees would have little incentive to "move the[ir] invention[s] into the private sector." S. Rep. No. 99–283, at 14, *reprinted in* 1986 U.S.C.C.A.N. at 3456. Such a construction would hinder one of the FTTA's purposes.[5]

Finally, to the extent that the "as compensation for services" language of § 209 is ambiguous, it should be interpreted in light of the rule of lenity. *See Crandon*, 494 U.S. at 182–83 (Scalia, J., concurring in the judgment) (referring to that language as a "troublesome phrase" devoid of a "clear and constant meaning"); *id.* at 178 (describing administrative interpretations of the phrase as "unpredictable"); *see also* Nolan, *supra*, at 102 (describing § 209's meaning as "uncertain" and noting that "interpretations of section 209 and its predecessors have sometimes been tortured"). Interpreting different language in § 209, the *Crandon* Court looked to this "time-honored interpretive guideline" that ambiguities in criminal statutes should be construed narrowly because of the due process requirement of "fair warning of the boundaries of criminal conduct." *Crandon*, 494 U.S. at 158 (quoting *Liparota v. United States*, 471 U.S. 419, 427 (1985)). In general, "[c]riminal statutes should be given the meaning their language most obviously invites. Their scope should not be extended to conduct not clearly within their terms." *United States v. Williams*, 341 U.S. 70, 82 (1951) (plurality opinion).

## Conclusion

We therefore conclude that, in the usual case, § 209 does not bar employee-inventors from receiving outside royalties. As you observe in your letter, "in any section 209 analysis, the facts of individual cases would have to be examined." Potts letter at 11 n.7. In the typical case, however, we do not think that outside royalties would be paid "as compensation for [the employee-inventor's] services as an officer or employee of the executive branch." 18 U.S.C. § 209(a).

RANDOLPH D. MOSS
*Assistant Attorney General*
*Office of Legal Counsel*

---

[5] As you note, the legislative history of the FTTA indicates that Congress intended to "make no changes in the conflict of interest laws affecting Federal employees or former Federal employees." Potts letter at 5 (quoting S. Rep. No. 99–283, at 10, *reprinted in* 1986 U.S.C.C.A.N. at 3451). As discussed above, however, we believe that § 209 is best read as ordinarily not barring outside royalty payments. On this view, it was not necessary for Congress to amend that section when it enacted the FTTA.