**TEXTILE SECRETS
INTERNATIONAL,
INC., Plaintiff,**

v.

**YA–YA BRAND INCORPORATED,
et al., Defendants.**

**No. CV 06–6297–PLA.**

United States District Court,
C.D. California,
Western Division.

Oct. 31, 2007.

Douglas A. Linde, Erica L. Allen, Linde Law Firm, Los Angeles, CA, for Plaintiff.

Dylan Ruga, Michael R. Heimbold, Steptoe and Johnson, Los Angeles, CA, for Defendants.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

PAUL L. ABRAMS, United States Magistrate Judge.

## I.

### *BACKGROUND*

Now pending before the Court and ready for decision is a Motion for Summary Judgment ("Motion") filed by defendants Ya–Ya Brand Incorporated, Bluefly, Inc., Bop, LLC, Saks Incorporated, and Ron Herman, Inc., on August 23, 2007.

In the operative Second Amended Complaint, plaintiff Textile Secrets International, Inc., ("TSI" or "plaintiff") asserts three causes of action against defendants: the first, for copyright infringement under 17 U.S.C. § 101, *et seq.;* the second, for contributory copyright infringement; and the third, for removing "copyright management information" in violation of 17 U.S.C. § 1202(b), a provision of the Digital Millennium Copyright Act ("DMCA"). Defendants contend that they are entitled to summary judgment on all claims because no triable issues of fact exist regarding (1) plaintiff's ownership of the copyright at issue, and (2) defendants' removal of copyright management information.[1] In sup-

---

1. On August 24, 2007, one day after defen- dants filed the instant Motion, the Court

port of the Motion, defendants filed a "Statement of Uncontroverted Facts and Conclusions of Law" and a declaration from defense counsel Dylan Ruga with attached exhibits.

On September 5, 2007, plaintiff filed an Opposition, a "Statement of Genuine Issues in Opposition to Defendants' Motion for Summary Judgment," declarations from Shawn Pazooky, Danny Pourrahmani, Lorin Brennan, and plaintiffs counsel Douglas Linde, and exhibits. On September 11, 2007, defendants filed a Reply.

On September 13, 2007, plaintiff filed an "Application to File a Sur–Reply in Opposition to Defendants' Motion for Summary Judgment" (the "Application") along with the Sur–Reply. On September 18, 2007, defendants filed an Opposition to the Application.[2]

The matter was taken under submission without oral argument. *See* Local Rule 7–15.

## II.

### *LEGAL STANDARD*

The Court must render summary judgment if the papers "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is "material" only if it might affect the outcome of the suit under governing

law. *Id.* at 248, 106 S.Ct. 2505. Inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *See Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). At the summary judgment stage, the judge's function is not to weigh the evidence or determine the truth of the matter but, rather, to determine whether there is any genuine issue for trial. *See Liberty Lobby*, 477 U.S. at 249, 106 S.Ct. 2505. Summary judgment is appropriate if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Consequently, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. 2505. Summary judgment cannot be avoided by relying solely on conclusory allegations unsupported by factual data. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir.1989).

## III.

### *FACTUAL SUMMARY*

Textile Secrets International, Inc., is in the business of wholesale textile designs and sales, and is jointly owned by Dariush Pourrahmani ("Pourrahmani") and Shazar Pazooky ("Pazooky"). (Defendants' Statement of Uncontroverted Facts

granted plaintiff's request to file a Second Amended Complaint in order to add twenty-two new defendants to the case. Because the three causes of action asserted against defendants Ya–Ya Brand Incorporated, Bluefly, Inc., Bop, LLC, Saks Incorporated and Ron Herman, Inc., in the Second Amended Complaint are identical to the three causes of

action asserted against them in the First Amended Complaint, the Court construes the instant Motion as seeking summary judgment on the claims as they now appear in the Second Amended Complaint.

2. The Court discusses plaintiff's Application regarding the sur-reply *infra*.

("Defendants' SUF") Nos. 1–2). Pourrahmani operates as TSI's design director and Pazooky is in charge of the company's operations. (Defendants' SUF No. 3).

In 2004, TSI created a fabric design based on peacock feathers that was given the internal designation "JPG08" or "FEATHERS." (Defendants' SUF No. 6). TSI has a copyright registration certificate for the FEATHERS design, which was signed by Pazooky on April 3, 2006. (Defendants' SUF Nos. 7, 15). The copyright registration indicates that the FEATHERS design is a "work made for hire." (Defendants' SUF No. 8).

Ya–Ya Brand Incorporated ("Ya–Ya") is a high-end clothing designer owned by Yael Aflalo. (Defendants' SUF No. 9). Ya–Ya designs, manufactures, and sells garments to various clothing stores. (Defendants' SUF Nos. 10, 12). Ya–Ya created five different garment styles bearing designs similar to FEATHERS and offered them for sale for one month primarily through Ya–Ya's showrooms in Los Angeles and New York. (Defendants' SUF No. 13). Ya–Ya sold the allegedly infringing garments to several customers who, in turn, sold the garments to the public. (Defendants' SUF No. 14).

**Facts Regarding the Creation of the FEATHERS Design**

According to plaintiff, Pourrahmani created the FEATHERS design with the assistance of a TSI staff designer. (Plaintiff's Statement of Genuine Issues in Opposition to Defendants' Motion for Summary Judgment ("Plaintiffs Statement") Nos. 4, 5, 16, 17).

In discovery responses, plaintiff identified Pourrahmani as the creator of FEATHERS. (Defendants' SUF No. 17). Pourrahmani testified in his deposition that, based on prior successful feather designs, he came up with the idea to create FEATHERS. Pourrahmani then asked one of TSI's female staff designers to draw the FEATHERS pattern. (Plaintiff's Statement Nos. 16–17; Defendants' Exhibit ("Exh.") A (Pourrahmani Deposition) at 28–30, 36). Although Pourrahmani could not recall the name of the designer in question (who, at the time of Pourrahmani's deposition, was no longer working at TSI), Pourrahmani stated that he participated in the creation of FEATHERS by overseeing the designer's work and going over the details of the pattern with her. Pourrahmani testified that the designer was an employee of TSI and TSI paid her paychecks, that the designer was not hired on a "per project" basis, and that the designer created FEATHERS while working in TSI's design room. (See Defendants' Exh. A at 16–17, 26–27, 34–35). Pourrahmani did not know, however, how long the staff designer spent working on the FEATHERS design or how much time he spent supervising the creation of the design. (Defendants' SUF Nos. 30–31).

In Pazooky's deposition, Pazooky testified that Pourrahmani was the person who came up with the FEATHERS design, and that while another individual in TSI's design studio helped to create the print, Pourrahmani was the director of design and thus had "final say on the design." (See Defendants' Exh. B (Pazooky Deposition) at 7–9, 10–11). At the time of Pazooky's deposition, Pazooky could not remember the name of the staff designer who drew the FEATHERS pattern. (Defendants' SUF No. 27).

Plaintiff states that Pazooky has since searched TSI's records and can now identify Regine Legler as the designer who drew FEATHERS. (Plaintiff's Statement No. 27). According to plaintiff, Ms. Legler was a TSI employee who was paid a salary and had taxes withheld, she worked in TSI's design room using TSI's tools to draw patterns, she performed tasks as-

signed by Pourrahmani and at Pourrahmani's direction, and she had a flexible but consistent work schedule and was not permitted to "come and go as she pleased." (Plaintiff's Statement Nos. 34–35; Pourrahmani Declaration at ¶¶ 4–9; Pazooky Declaration at ¶¶ 2–7).[3]

## IV.

### DISCUSSION

### A. THE COPYRIGHT INFRINGEMENT CLAIM

█ Plaintiff contends in its first cause of action that defendants infringed on its copyrighted fabric design, FEATHERS. Defendants move for summary judgment on this claim on the ground that plaintiff has not established that it owns the copyright to the FEATHERS design. In particular, defendants argue that no triable issue exists as to whether FEATHERS was a "work made for hire" within the meaning of the Copyright Act.

#### 1. Copyright Law Regarding a "Work Made for Hire"

To prevail on a claim of copyright infringement, the plaintiff must prove ownership of the work in question and that the defendant copied protected elements of the work. *Metcalf v. Bochco*, 294 F.3d 1069, 1072 (9th Cir.2002). Copyright ownership "vests initially in the author or authors of the work." 17 U.S.C. § 201(a). In the case of a "work made for hire," however, "the employer or other person for whom the work was prepared is considered the author ..., and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright." 17 U.S.C. § 201(b).

A "work made for hire" is defined in relevant part as:

(1) a work prepared by an employee within the scope of his or her employment; or

(2) a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire.

17 U.S.C. § 101.

█ According to this two-part definition, "a work for hire can arise through one of two mutually exclusive means": the first part applies to works made by employees and the second part applies to works made by independent contractors. *Community For Creative Non–Violence v. Reid*, 490 U.S. 730, 742–43, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989). In *Reid*, the Supreme Court looked to the general common law of agency in determining whether a hired party was an employee or an independent contractor, and set forth the following list of factors as relevant to this determination: the hiring party's right to control the manner and means by which the work is created; the level of skill required to create the work; the provision of tools and the location for the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired individual; the extent of the hired individual's discretion over when and how long to work; the method of payment; the

---

**3.** Defendants argue that because plaintiff failed to supplement its earlier discovery responses with information pertaining to Regine Legler, this "new" evidence should be excluded pursuant to Rule 37(c)(1) of the Federal Rules of Civil Procedure. The Court discusses this issue *infra*.

hired individual's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; the provision of employee benefits; and the tax treatment of the hired individual. *Id.* at 751, 109 S.Ct. 2166.

## 2. A Genuine Issue of Material Fact Exists Regarding Whether Plaintiff Owns a Valid Copyright in the FEATHERS Design

■ Here, the record shows that in 2006, plaintiff obtained a certificate of copyright registration in the FEATHERS design, which constitutes prima facie evidence of copyright ownership. *See* 17 U.S.C. § 410(c) ("In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate."). Although the copyright registration certificate gives rise to the presumption that plaintiff owns the copyright, defendants may rebut this presumption with "some evidence or proof to dispute or deny the plaintiff's prima facie case of infringement." *Entm't Research Group, Inc. v. Genesis Creative Group,* 122 F.3d 1211, 1217 (9th Cir.1997).

Defendants assert the following arguments to counter plaintiff's claim of copyright ownership: (1) plaintiff cannot demonstrate that the designer of FEATHERS was an employee as opposed to an independent contractor (*see* Motion at 8); (2) plaintiff cannot demonstrate that the designer of FEATHERS was acting within the scope of employment when she created the design (*see* Motion at 9–10); (3) plaintiff cannot prove that the person who created FEATHERS was an artist rather than, for example, an accountant or other employee who does not regularly create designs within the scope of her employment (*see* Motion at 10); and (4) even if the design was created by one of plaintiff's

artists, the work was not necessarily done "within the scope of employment" because it could have been created by the artist after-hours at the artist's home for a purpose unrelated to plaintiff's business (*see* Motion at 10).

The record shows that in Pourrahmani's deposition, he testified to the following: one of TSI's designers designed the pattern; it was Pourrahmani's idea for the designer to create the FEATHERS design; the designer received paychecks from TSI; and the designer was not hired on a "per project" basis. (*See* Defendants' Exh. A at 16–17, 26–27, 35). TSI's other co-owner, Pazooky, testified that Pourrahmani was the person who came up with the FEATHERS design although someone in the design studio helped create the print, and that Pourrahmani, as the director of design, has "final say" on TSI's designs. (*See* Defendants' Exh. B at 7–9, 10–11). At the time of their depositions, neither Pazooky nor Pourrahmani could recall the name of the designer or most other specifics regarding the designer's employment at TSI.

In the Opposition, however, plaintiff included declarations from Pazooky and Pourrahmani explaining that they can now identify Regine Legler as the TSI employee who designed FEATHERS. According to their declarations, Ms. Legler worked in TSI's design room using TSI's tools to draw patterns, she performed tasks assigned by Pourrahmani, she did not hire or pay any of her own assistants, and she maintained a flexible but consistent work schedule and was not permitted to "come and go as she pleased." Plaintiff also attached as an exhibit a W–4 form for Ms. Legler apparently signed by her on April 5, 2000. (*See* Plaintiff's Exh. 2).

Plaintiff asserts that summary adjudication of the copyright infringement claim is not appropriate because, from the above

evidence, a jury could make any of the following determinations that ultimately proves plaintiff owns the copyright: (1) Pourrahmani is the artist that created FEATHERS; (2) the TSI staff designer who drew the work, Regine Legler, is the artist that created FEATHERS; or (3) FEATHERS was a joint work between Pourrahmani and the TSI staff designer, Regine Legler. (*See* Opposition at 5).

Defendants contend that because plaintiff unreasonably delayed providing the information regarding Regine Legler and her employment relationship with TSI, despite the fact that the information had been requested in defendants' interrogatories to plaintiff and at the depositions of Pourrahmani and Pazooky,[4] the new evidence should be excluded for purposes of the summary judgment proceeding pursuant to Rule 37(c)(1) of the Federal Rules of Civil Procedure.[5] (*See* Motion at 11–12). In support, defendants cite *Cambridge Electronics Corp. v. MGA Electronics, Inc.,* 227 F.R.D. 313 (C.D.Cal.2004), where the plaintiffs evidence in opposition to a summary judgment motion was excluded

on account of the plaintiff's failure to supplement its interrogatory responses with relevant information.

While it appears from the record that plaintiff failed to diligently supplement its discovery responses by identifying Ms. Legler as the designer who drew the FEATHERS pattern, the Court finds that even if the new evidence regarding Ms. Legler is not considered, there remain sufficient facts regarding her employment as a TSI staff designer such that a triable issue exists regarding the authorship of the FEATHERS design.

Pourrahmani testified that he came up with the idea to make FEATHERS based upon prior successful feather prints, and asked one of the designers to draw his concept. Once the initial draft was completed, Pourrahmani then worked with the designer to refine the details of the print. The designer worked in TSI's design room and was not hired on a "per project" basis. Pazooky confirmed in his deposition that the FEATHERS design was Pourrahmani's idea and that Pourrahmani has "final say" over all designs created for

---

**4.** Defendants allege the following with respect to the discovery dispute: on February 21, 2007, defendants served their first set of interrogatories on plaintiff asking plaintiff to identify all persons who were responsible for creating FEATHERS. Plaintiff responded by identifying Pourrahmani as the creator. (Defendants' SUF Nos. 18, 19). On May 18, 2007, defendants noticed the Rule 30(b)(6) deposition of TSI and asked that TSI designate the proper individual to testify about, among other things, the creation of the FEATHERS design. (Defendants' SUF No. 20). Plaintiff designated Pourrahmani, and at Pourrahmani's deposition he testified that one of TSI's artists actually drew the design. (Defendants' SUF No. 22). Subsequently, on three separate occasions, defendants requested in writing that plaintiff supplement its original response to Interrogatory no. 1 to identify all persons responsible for creating FEATHERS. (Defendants' SUF No. 23). Plaintiff did not provide any supplemental

response. (Defendants' SUF No. 24). Defendants then requested that plaintiff re-designate the individual qualified to testify regarding the creation of the FEATHERS design. (Defendants' SUF No. 26). Plaintiff designated Pazooky, who testified that Pourrahmani created the design, but he could not recall who helped Pourrahmani with the creation. (Defendants' SUF No. 27).

**5.** Rule 37(c)(1) provides in pertinent part: "A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed. In addition to or in lieu of this sanction, the court, on motion and after affording an opportunity to be heard, may impose other appropriate sanctions...."

TSI. By looking to the common law of agency pursuant to *Reid, supra,* the Court finds triable issues concerning the employment relationship between TSI and the staff designer (Ms. Legler) and, in turn, concerning whether FEATHERS was created by a TSI employee within the course and scope of employment such that the pattern was a "work made for hire." In particular, from Pourrahmani's and Pazooky's deposition testimony, the following factors could lead to the conclusion that the designer of FEATHERS was an employee of TSI acting within the course and scope of employment: Pourrahmani assigned the designer the task of creating the FEATHERS print, Pourrahmani exercised control over the FEATHERS design in that he had "final say" over the pattern, the designer utilized TSI's design room to create the pattern, and the designer was not hired on a "per project" basis.[6]

Because authorship of FEATHERS is a genuine issue of material fact which cannot be determined from the record, summary adjudication is inappropriate with respect to the first cause of action for copyright infringement.

## B. THE CONTRIBUTORY COPYRIGHT INFRINGEMENT CLAIM

In the second cause of action, plaintiff asserts that defendants are liable for contributory copyright infringement. Under the doctrine of contributory infringement, " '[o]ne who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a "contributory" infringer.' " *Fonovisa, Inc. v. Cherry Auction, Inc.,* 76 F.3d 259, 264 (9th Cir.1996) (citation omitted).

Defendants contend that this claim must fail for the same reasons that the first cause of action must fail, *i.e.,* that plaintiff cannot prove it owns a valid copyright in the FEATHERS design. (*See* Motion at 12). In support, defendants cite *A & M Records, Inc. v. Napster, Inc.,* 239 F.3d 1004, 1013 n. 2 (9th Cir.2001), for the proposition that secondary liability for copyright infringement does not exist in the absence of direct infringement by a third party.

Because the Court has determined that triable issues exist with respect to the claim of direct infringement, it follows that triable issues also exist regarding the claim of contributory infringement. Accordingly, summary adjudication of the second cause of action is not appropriate.

## C. THE "DIGITAL MILLENNIUM COPYRIGHT ACT" CLAIM

Plaintiff in the third cause of action asserts that defendants violated 17 U.S.C. § 1202(b), a provision of the Digital Millennium Copyright Act. In support, plaintiff alleges that it produced "sample yardage" of fabric bearing the FEATHERS design. The sample yardage had markings on the selvage[7] that listed plaintiff's name and the copyright symbol. When

---

6. If the new evidence provided by plaintiff regarding Ms. Legler's employment at TSI is taken into account, the Court's determination that triable issues exist regarding the authorship of FEATHERS is significantly bolstered. For the reasons explained *supra,* however, even absent the new evidence, the Court denies the motion for summary adjudication on the copyright infringement claim. Accordingly, the Court finds that it is not necessary to determine whether the evidence should be excluded under Rule 37(c)(1). As such, defendants' "Objections to Plaintiff's Declarations Submitted in Opposition to Defendants' Motion for Summary Judgment" and "Objections to and Motion to Strike Plaintiff's Opposition to Defendants' Request to Exclude Evidence Pursuant to FRCP 37(c)(1)" are overruled as moot.

7. "Selvage" is the edge or border of the fabric that is intended to be cut off and discarded.

the fabric was sold to a customer, a tag was attached that stated the design is a registered work of TSI. (*See* Pourrahmani Declaration at ¶10). Plaintiff urges that these two identifying markers (*i.e.*, the information on the selvage and the tag) constitute "copyright management information" within the meaning of the DMCA, and that by removing this information and making copies of the FEATHERS design, defendants violated 17 U.S.C. § 1202(b), the statute that protects the integrity of copyright management information.

The provision of the DMCA at issue, 17 U.S.C. § 1202(b), provides the following:

No person shall, without the authority of the copyright owner or the law—

(1) intentionally remove or alter any copyright management information,

(2) distribute or import for distribution copyright management information knowing that the copyright management information has been removed or altered without authority of the copyright owner or the law, or

(3) distribute, import for distribution, or publicly perform works, copies of works, or phonorecords, knowing that copyright

management information has been removed or altered without authority of the copyright owner or the law,

knowing, or ... having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement of any right under this title.

The term "copyright management information" is defined in 17 U.S.C. § 1202(c) as information, such as the title, author, or copyright owner of a work, or the terms and conditions for the use of a work, that is "conveyed in connection with copies or phonorecords of a work or performances or displays of a work, including in digital form[.]" *See* 17 U.S.C. § 1202(c).[8]

Defendants contend, *inter alia*, that the information regarding TSI on the fabric should not be considered "copyright management information" within the meaning of the DMCA. In support, defendants argue that the term "copyright management information" is ambiguous because, although its definition is broad, it is nevertheless contained within the DMCA, a statutory scheme which primarily applies to goods and transactions that take place on the Internet or in the "electronic market-

---

8. 17 U.S.C. § 1202(c) provides:

"[C]opyright management information" means any of the following information conveyed in connection with copies or phonorecords of a work or performances or displays of a work, including in digital form, except that such term does not include any personally identifying information about a user of a work or of a copy, phonorecord, performance, or display of a work:

(1) The title and other information identifying the work, including the information set forth on a notice of copyright.

(2) The name of, and other identifying information about, the author of a work.

(3) The name of, and other identifying information about, the copyright owner of the work, including the information set forth in a notice of copyright.

(4) With the exception of public performances of works by radio and television broadcast stations, the name of, and other identifying information about, a performer whose performance is fixed in a work other than an audiovisual work.

(5) With the exception of public performances of works by radio and television broadcast stations, in the case of an audiovisual work, the name of, and other identifying information about, a writer, performer, or director who is credited in the audiovisual work.

(6) Terms and conditions for use of the work.

(7) Identifying numbers or symbols referring to such information or links to such information.

(8) Such other information as the Register of Copyrights may prescribe by regulation, except that the Register of Copyrights may not require the provision of any information concerning the user of a copyrighted work.

place." Thus, defendants urge, the Court should consider the legislative history of § 1202, which reveals that the statute does not apply to the facts of this case involving copyright information on fabric. (*See* Motion at 15–16). Plaintiff, on the other hand, contends that § 1202(c) is not ambiguous, and that a plain reading of the language leads to the conclusion that "copyright management information" can be found on *all* works, that is, on works in both digital and nondigital form. According to plaintiff, this means that the information regarding TSI set forth on the tag and selvage portion of the FEATHERS fabric constitutes "copyright management information" within the meaning of § 1202(c), and that defendants are liable under the DMCA for removing such information. (*See* Opposition at 16).

### 1. Statutory Construction of 17 U.S.C. § 1202

The basic principles of statutory construction are well established:

The purpose of statutory construction is to discern the intent of Congress in enacting a particular statute. The first step in ascertaining congressional intent is to look to the plain language of the statute. To determine the plain meaning of a particular statutory provision, and thus congressional intent, the court looks to the entire statutory scheme. If the statute uses a term which it does not define, the court gives that term its ordinary meaning. The plain meaning of the statute controls, and courts will look no further, unless its application leads to unreasonable or impracticable results. If the statute is ambiguous—and only then—courts may look to its legislative history for evidence of congressional intent.

*United States v. Daas,* 198 F.3d 1167,1174 (9th Cir.1999) (citations omitted).

"[S]tatutory language must always be read in its proper context. 'In ascertaining the plain meaning of a statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole.' " *McCarthy v. Bronson,* 500 U.S. 136, 139, 111 S.Ct. 1737, 114 L.Ed.2d 194 (1991) (quoting *K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 291, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988)); *see also Robinson v. Shell Oil Co.,* 519 U.S. 337, 117 S.Ct. 843, 846, 136 L.Ed.2d 808 (1997) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."); *Crandon v. United States,* 494 U.S. 152, 158, 110 S.Ct. 997, 108 L.Ed.2d 132 (1990) ("[i]n determining the meaning of the statute, we look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy"); *Padash v. I.N.S.,* 358 F.3d 1161, 1170 (9th Cir.2004) ("We must analyze the statutory provision in question in the context of the governing statute as a whole, presuming congressional intent to create a coherent regulatory scheme."). In this regard, the Court must " 'mak[e] every effort not to interpret [the] provision [at issue] in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous.' " *Padash,* 358 F.3d at 1170–71 (quoting *Boise Cascade Corp. v. E.P.A.,* 942 F.2d 1427, 1432 (9th Cir.1991)).

Applying the foregoing principles, the Court looks to § 1202 not in isolation, but within the overall statutory scheme of the DMCA to ensure that the language at issue is considered in its proper context.[9]

9. The DMCA is comprised of five Titles: Title I covers the World Intellectual Property Organization ("WIPO") Treaties Implementation; Title II covers Online Copyright Infringement Liability Limitations; Title III

Section 1202 is found within Chapter 12 of the Copyright Act. The first statutory provision in Chapter 12, 17 U.S.C. § 1201, provides that "[n]o person shall circumvent a technological measure that effectively controls access to a [protected] work" (17 U.S.C. § 1201(a)(1)(A)), and goes on to prohibit the manufacturing, importing, offering to the public, providing, or otherwise trafficking in any technology, product, service, device, component, or part thereof, that "(A) is primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to a [copyrighted work]; (B) has only limited commercially significant purpose or use other than to circumvent a technological measure that effectively controls access to a [copyrighted work]; or (C) is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing a technological measure that effectively controls access to a [copyrighted work]." 17 U.S.C. § 1201(a)(2).[10] The next provision is § 1202, which serves to protect the integrity of copyright management information, and also sets limitations on liability in the case of certain analog and digital transmissions. (See 17 U.S.C. § 1202(e)). Sections 1203 and 1204 provide, respectively, for civil remedies and criminal penalties as a result of violations of § 1201 and § 1202. Lastly, § 1205 sets forth the following "savings clause": "Nothing in this chapter abrogates, diminishes, or weakens the provisions of, nor

provides any defense or element of mitigation in a criminal prosecution or civil action under, any Federal or State law that prevents the violation of the privacy of an individual in connection with the individual's use of the Internet." 17 U.S.C. § 1205.

Adopting plaintiffs approach to the statute, a literal interpretation of "copyright management information" as defined in § 1202(c) would in effect give § 1202 limitless scope in that it would be applicable to all works bearing copyright information as listed in § 1202(c)(1)-(8). In other words, § 1202 would apply, as one court put it, "wherever any author has affixed anything that might refer to his or her name." *IQ Group, Ltd. v. Wiesner Publishing, LLC,* 409 F.Supp.2d 587, 593 (D.N.J.2006). However, considering § 1202's placement in the structure of the DMCA—a statutory scheme which, along with protecting the integrity of copyright management information, also prohibits the circumvention of technological measures that protect copyrighted works—the Court finds that such a wide-reaching interpretation would not be proper. Thus, to avoid applying the statute in such a way that would lead to "impracticable results," the Court finds it necessary to discern the congressional intent in enacting § 1202, and therefore considers the relevant legislative history.

As an overview of the history of the DMCA, the Court notes the summary provided by the Second Circuit:

covers Computer Maintenance or Repair Copyright Exemptions; Title IV covers Miscellaneous Provisions; and Title V covers Protection of Certain Original Designs. (*See* Defendants' Exh. P at 479–80). Of relevance here is Title I, which encompasses Chapter 12 of the Copyright Act, which in turn contains § 1202. (*See id.* at 485–97).

10. 17 U.S.C. § 1201(a)(3)(A) defines the term "to circumvent a technological measure" as "to descramble a scrambled work, to decrypt

an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner." In turn, under 17 U.S.C. § 1201(a)(3)(B), a technological measure "effectively controls access to a work" "if the measure, in the ordinary course of its operation, requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work."

The DMCA was enacted in 1998 to implement the World Intellectual Property Organization Copyright Treaty ("WIPO Treaty"), which requires contracting parties to "provide adequate legal protection and effective legal remedies against the circumvention of effective technological measures that are used by authors in connection with the exercise of their rights under this Treaty or the Berne Convention and that restrict acts, in respect of their works, which are not authorized by the authors concerned or permitted by law." WIPO Treaty, Apr. 12, 1997, art. 11, S. Treaty Doc. No. 105–17 (1997), available at 1997 WL 447232. Even before the treaty, Congress had been devoting attention to the problems faced by copyright enforcement in the digital age. Hearings on the topic have spanned several years. [Citations.] This legislative effort resulted in the DMCA.

*Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 440 (2nd Cir.2001).

### a. The "White Paper"

Although it is widely noted that the DMCA was enacted to implement the WIPO treaties, the origin of the Act can be traced further back to a report known as the "White Paper." As discussed below, the White Paper came about as a result of the Clinton Administration's efforts to address the issue of modernizing copyright enforcement.

In 1993, the Clinton Administration established the Information Infrastructure Task Force ("IITF") which was given the mandate to develop "comprehensive telecommunications and information policies that will promote the development of the [National Information Infrastructure ('NII') ]." (*See* Defendants' Exh. N at 173). The IITF included, *inter alia*, the Information Policy Committee which, in turn, encompassed the Working Group on Intellectual Property Rights (the "Working Group"). "The Working Group ... was established ... to examine the intellectual property implications of the NII and make recommendations on any appropriate changes to U.S. intellectual property law and policy." (*Id.* at 174).[11] In 1995, after holding extensive hearings and soliciting public comments, the Working Group released the Report of the Working Group on Intellectual Property Rights, known as the "White Paper."

The purpose of the White Paper was "to discuss the application of [then] existing copyright law and to recommend ... changes that [were] essential to adapt the law to the needs of the global information society." (Defendants' Exh. N at 174). The White Paper defined "copyright management information" as the name and other identifying information of the author of a work, the name and identifying information of the copyright owner, and the terms and conditions for uses of the work. The White Paper set forth that "copyright management information" would "serve as a kind of license plate for a work on the information superhighway, from which a user may obtain important information about the work." (*Id.* at 407). The White Paper included a draft of § 1201 and § 1202,[12] and discussed the underlying ra-

---

11. As discussed in the Report, the NII "encompasses digital, interactive services.... such as the Internet, as well as those [services] contemplated for the future." (Defendants' Exh. N at 174 n. 5).

12. Of relevance here, the White Paper's draft of § 1202(b) provided: "No person shall, without authority of the copyright owner or the law, (i) knowingly remove or alter any copyright management information, (ii) knowingly distribute or import for distribution copyright management information that has been altered without authority of the copyright owner or the law, or (iii) knowingly distribute or import for distribution copies or

tionale for these provisions:

Systems for managing rights in works are being contemplated in the development of the NII. These systems will serve the functions of tracking and monitoring uses of copyrighted works as well as licensing of rights and indicating attribution, creation and ownership interests. A combination of file- and system-based access controls using encryption technologies, digital signatures and steganography are, and will continue to be, employed by owners of works to address copyright management concerns. Such security measures must be carefully designed and implemented to ensure that they not only effectively protect the owner's interests in the works but also do not unduly burden use of the work by consumers or compromise their privacy. And measures should be studied to ensure that systems established to serve these functions are not readily defeated.

To implement these rights management functions, information will likely be included in digital versions of a work (i.e., copyright management information) to inform the user about the authorship and ownership of a work (e.g., attribution information) as well as to indicate authorized uses of the work (e.g., permitted use information). For instance, information may be included in an "electronic envelope" containing a work that provides information regarding authorship, copyright ownership, date of creation or last modification, and terms and conditions of authorized uses. As measures for this purpose become incorporated at lower levels (e.g., at the operating system level), such information may become a fundamental component of a file or information object.

Once information such as this is affiliated with a particular information object (e.g., data constituting the work) and readily accessible, users will be able to easily address questions over licensing and use of the work. For example, systems for electronic licensing may be developed based on the attribution or permitted use information associated with an information object.

(Defendants' Exh. N at 363–64).

### b. The National Information Infrastructure Copyright Protection Act

After the White Paper was published, the National Information Infrastructure Copyright Protection Act ("NIICPA") was introduced in the House and Senate. The provisions of the NIICPA, which included drafts of § 1201 and § 1202, were taken verbatim from the White Paper. See Julie E. Cohen, *A Right to Read Anonymously: A Closer Look at "Copyright Management" in Cyberspace,* 28 Conn. L.Rev. 981, 989 (1996) (discussing the NIICPA and §§ 1201 and 1202). Multiple hearings on the proposed legislation were held, but ultimately the NIICPA stalled due to unsettled issues concerning the scope of liability of service providers for the infringing acts of their users. (*See* Defendants' Exh. M at 78–79).

### c. The WIPO Treaties

On the international front, parallel efforts to ensure protection of copyrighted works in the digital age proceeded as well. In December, 1996, the WIPO held a con-

phonorecords from which copyright management information has been removed without authority of the copyright owner or the law." The draft of § 1202(c) provided: "As used in this chapter, 'copyright management information' means the name and other identifying information of the author of a work, the name and other identifying information of the copyright owner, terms and conditions for uses of the work, and such other information as the Register of Copyrights may prescribe by regulation." (Defendants' Exh. N at 418–19).

ference in Switzerland which culminated in the adoption of two treaties, the "WIPO Copyright Treaty" and the "WIPO Performances and Phonograms Treaty," which were agreed to by a consensus of 160 countries. (Defendants' Exh. M at 79). The WIPO treaties addressed concerns regarding the modification or removal of copyright management information, and instituted a "double protection for technical measures":

> On one hand, the treaties provide protection for "effective technological measures that are used by authors in connection with the exercise of their rights under this Treaty or the Berne Convention and that restricts acts, in respect with their works, which are not authorized by the authors concerned or permitted by law." On the other hand, they provide protection for the "Rights Management Information." [13] In the latter case, Article 12(1) of the Copyright Treaty provides that:

> Contracting parties shall provide adequate and effective legal remedies against any person knowingly performing any of the following acts knowing, or with respect to civil remedies having reasonable grounds to know, that it will induce, enable, facilitate or conceal an infringement of any right covered by this Treaty or the Berne Convention: (i) to remove or alter any electronic rights management information without authority; (ii) to distribute, import for distribution, broadcast or communicate to the public, without authority, works or copies of works knowing that electronic rights management information has been removed or altered without authority.

CMI is defined in Article 12 of the WIPO Treaties as:

> [I]nformation which identifies the work, the author of the work, the owner of any right in the work, or information about the terms and conditions of use of the work, and any numbers or codes that represent such information, when any of these items of information is attached to a copy of a work or appears in connection with the communication of a work to the public.

S. Dusollier, *Some Reflections on Copyright Management Information and Moral Rights,* 25 Colum. J.L. & Arts 377, 382–83 (2003) (footnotes omitted).

### d. Congressional Reports on the DMCA

Prior to the enactment of the DMCA in 1998, committees from the House and Senate published reports regarding the Act.

With respect to the WIPO treaties, the House Committee remarked:

> The treaties will ensure adequate protection for American works in countries around the world at a time when borderless digital means of dissemination are becoming increasingly popular. While such rapid dissemination of perfect copies will benefit both U.S. owners and consumers, it will unfortunately also facilitate pirates who aim to destroy the value of American intellectual property.

> The successful negotiation of the treaties brings with it the need for domestic implementing legislation. Title I of this bill [the DMCA] contains two substantive additions to U.S. domestic law ... to bring the law into compliance with the treaties so that they may be ratified appropriately.

(Defendants' Exh. O at 446).

The House Committee explained that implementation of the WIPO treaties re-

---

**13.** Plaintiff explains that the term "rights management information" is used in the WIPO treaties, while the term "copyright management information" is used in the DMCA. (*See* Opposition at 18).

quired "two technological adjuncts to copyright law, intended to ensure a thriving electronic marketplace for copyrighted works on the internet." The first "technological adjunct" concerned anti-circumvention measures and is embodied in 17 U.S.C. § 1201. (*See* defendants' Exh. O at 446–47). The second "technological adjunct," embodied in 17 U.S.C. § 1202, was needed to ensure "the integrity of the electronic marketplace by preventing fraud and misinformation." (*See id.* at 447).

The Senate Report similarly explained:

> Due to the ease with which digital works can be copied and distributed worldwide virtually instantaneously, copyright owners will hesitate to make their works readily available on the Internet without reasonable assurance that they will be protected against massive piracy. Legislation implementing the [WIPO] treaties provides this protection and creates the legal platform for launching the global digital on-line marketplace for copyrighted works.

(Defendants' Exh. M at 82–83).

Comments in the Senate Committee Report in reference to § 1202 in particular provide insight into the meaning of "copyright management information":

> The purpose of [copyright management information ("CMI")] is to facilitate licensing of copyright for use on the Internet and to discourage piracy.
>
> Copyright Management Information (CMI) is an important element in establishing an efficient Internet marketplace in copyrighted works free from governmental regulation. Such information will assist in tracking and monitoring uses of copyrighted works, as well as licensing of rights and indicating attribution, creation and ownership.
>
> Under the bill, CMI includes such items as the title of the work, the author, the copyright owner, and in some instances, the writer, performer, and di-

rector. CMI need not be in digital form, but CMI in digital form is expressly included. It is important to note that the DMCA does not require CMI, but if CMI is provided, the bill protects it from falsification, removal or alteration. Information that is not defined as CMI under the bill would not be protected by these provisions, although its removal or falsification might be protected under other laws, such as unfair trade.

(Defendants' Exh. M at 90–91).

In addition, the Court observes other statements by the congressional committees that shed light on the impetus for the new legislation. For example, the House Report included the following explanation regarding the background and need for the DMCA:

> The digital environment now allows users of electronic media to send and retrieve perfect reproductions of copyrighted material easily and nearly instantaneously, to or from locations around the world. With this evolution in technology, the law must adapt in order to make digital networks safe places to disseminate and exploit copyrighted works.... [¶] When copyrighted material is adequately protected in the digital environment, a plethora of works will be distributed and performed over the Internet. In order to protect the owner, copyrighted works will most likely be encrypted and made available to consumers once payment is made for access to a copy of the work....

(Defendants' Exh. O at 445–46).

The Senate Committee similarly observed that the DMCA was designed "to facilitate the robust development and world-wide expansion of electronic commerce, communications, research, development and education in the digital age." (Defendants' Exh. M at 77).

### 2. Cases Discussing the Scope of 17 U.S.C. § 1202

As the Court previously discussed in its Order denying defendants' Motion to Dismiss the First Amended Complaint, it appears that only two reported cases have thus far dealt with the scope and applicability of 17 U.S.C. § 1202. The first case, *IQ Group, Ltd. v. Wiesner Publishing, LLC*, 409 F.Supp.2d 587 (D.N.J.2006), involved the following facts: the plaintiff alleged that it had created certain e-mail advertisements for its clients, two insurances companies. The ads included the plaintiffs logo and a hyperlink that directed the user to the plaintiff's Web site which contained copyright notices. According to the plaintiff, it provided the e-mail ads to the two insurance companies, who in turn both hired the defendant to distribute the ads. The defendant copied and distributed the ads via e-mail, but only after removing the plaintiffs logo and hyperlink and adding new information so that responses to the ads would go to the insurance company clients. The plaintiff subsequently applied for copyright registration of the ads and filed suit in the District Court of New Jersey, alleging, among other claims, that the defendant had violated 17 U.S.C. § 1202. *Id.* at 589–90. The defendant sought summary judgment on the claim. In its consideration of the motion, the district court discussed the statutory interpretation of § 1202. Finding no reported cases on the issue, the court turned to scholarly writings, as well as the legislative history of the DMCA, before concluding that § 1202 should be construed to protect only copyright management performed by the technological measures of automated systems.[14] *Id.* at 593–98. In reaching this conclusion, the *IQ Group* court explained:

> [T]raditionally, the rights of authors have been managed by people, who have controlled access and reproduction. Through scientific advances, we now have technological measures that can control access and reproduction of works, and thereby manage the rights of copyright owners and users. Section 1202 operates to protect copyright by protecting a key component of some of these technological measures. It should not be construed to cover copyright management performed by people, which is covered by the Copyright Act, as it preceded the DMCA; it should be construed to protect copyright management performed by the technological measures of automated systems.

*Id.* at 597. The court went on to hold that the plaintiffs logo and hyperlink to copyright information did not constitute copyright management information under the DMCA, and that the defendant thus did not violate § 1202. *Id.* at 598.

The second case, out of the District Court in the Western District of Pennsylvania, interpreted § 1202 more expansively. *See McClatchey v. The Associated Press*, 2007 WL 776103 (W.D.Pa. March 9, 2007) (slip copy). In *McClatchey*, the plaintiff had obtained copyright protection for a photograph she took of the United 93 plane crash that occurred on September

---

**14.** In particular, the court in *IQ Group* reviewed an article by law professor Julie E. Cohen. *IQ Group*, 409 F.Supp.2d at 593 (citing Julie E. Cohen, *Copyright and The Jurisprudence of Self–Help*, 13 Berkeley Tech. L.J. 1089 (1998)). As summarized by the court: "Cohen explains that, traditionally, authors have relied on copyright law to define and protect their legal rights. Now, however, new technologies can control access to works, such that technology attached to the work itself defines and protects the legal rights of the copyright owner. The DMCA directly protects not the copyrights, but the technological measures that protect the copyrights. In Cohen's view, copyright management information ('CMI') is limited to components of such technological measures."

11,2001. The plaintiff kept in a binder a copy of the photograph bearing her title and copyright information. An Associated Press ("AP") photographer went to the plaintiff's home and, according to the plaintiff, took a snapshot of the copyrighted photograph. The photographer then "cropped" his picture of the photograph to remove the plaintiffs title and copyright notice. The cropped photograph was later distributed to the AP's member news organizations without the plaintiff's permission. *Id.* at \*1–\*2. The plaintiff brought suit under, *inter alia,* 17 U.S.C. § 1202. On defendant's motion for summary judgment, the *McClatchey* court rejected the defendant's argument that § 1202 did not apply. Specifically, because the plaintiff used a computer software program to print her title, name, and copyright notice on the copies of her photograph, the district court found that this "technological process" came within the term "digital 'copyright management information'" as defined in § 1202(c). *Id.* at \*5. The court further observed that under § 1202(c), the term "copyright management information" was broadly defined, and included protection for non-digital information as well. *Id.*

### 3. Plaintiff's Claim Under 17 U.S.C. § 1202 Lacks Merit

As the Court observed previously in the denial of defendants' Motion to Dismiss, the above district court decisions reflect a broad range of interpretations concerning the application of 17 U.S.C. § 1202. At the time of defendants' Motion to Dismiss, the Court found it premature to make any determination as to the applicability of § 1202 to the instant case as the facts had not yet been developed through discovery.[15] Now, however, after considering the evidence in support of the instant Motion and viewing § 1202 within the context of its legislative history, the Court is persuaded by the *IQ Group* court's conclusion that § 1202 is subject to a narrowing interpretation.

Pursuant to a narrower construction, the Court concludes that § 1202 is not applicable here, *i.e.,* where plaintiff alleges that defendants removed TSI's copyright information from the FEATHERS fabric before infringing on the design. While the Court does not attempt in this decision to define the precise contours of the applicability of § 1202, the Court nevertheless cannot find that the provision was intended to apply to circumstances that have no relation to the Internet, electronic commerce, automated copyright protections or management systems, public registers, or other technological measures or processes as contemplated in the DMCA as a whole. In other words, although the parties do not dispute that the FEATHERS fabric contained TSI's copyright information, there are no facts showing that any technological process as contemplated in the DMCA was utilized by plaintiff in placing the copyright information onto the FEATHERS fabric, or that defendants employed any technological

---

**15.** In the April 10, 2007, Order denying the Motion to Dismiss, the Court stated: "Multiple issues of fact may impact on the Court's determination of whether 17 U.S.C. § 1202 applies to the instant action, such as whether plaintiff employed a technological process in placing the copyright information on the fabric design, whether defendant employed a technological process in the alleged alternation or deletion of plaintiffs copyright information from the design, or whether defendant used any type of technological process in its alleged distribution of plaintiff's design. While defendants' Motion may be meritorious, and their position might eventually prevail, it is premature to dismiss the Third Cause of Action at this point in the litigation. Accordingly, the Motion to Dismiss is **DENIED.** This denial is without prejudice to defendants raising their arguments in a summary judgment motion."

process in either their removal of the copyright information from the design or in their alleged distribution of the design.[16] In short, the Court finds that, in light of the legislative intent behind the DMCA to facilitate electronic and Internet commerce, the facts of this case do not trigger § 1202.[17]

In making this determination, the Court takes into account defendants' argument that the *McClatchey* opinion is distinguishable because the District Court did not consider the legislative history of the DMCA before concluding that § 1202 was applicable in that case. The Court further observes that in other court opinions, discussions regarding the DMCA reflect the view that the Act's scope was intended to encompass the Internet and other forms of electronic transactions. *See, e.g., ALS Scan, Inc. v. RemarQ Communities, Inc.,* 239 F.3d 619, 625 (4th Cir.2001) (explaining that "[t]he DMCA was enacted both to preserve copyright enforcement on the Internet and to provide immunity to service providers from copyright infringement liability for 'passive,' 'automatic' actions in which a service provider's system engages through a technological process initiated by another without the knowledge of the service provider"); *United States v. Elcom Ltd.,* 203 F.Supp.2d 1111, 1125 (N.D.Cal. 2002) (Congress sought "to protect against unlawful piracy and promote the development of electronic commerce and the availability of copyrighted material on the Internet").

As noted by the *IQ Group* court, "Congress intended the DMCA to modernize copyright protection as a response to the development of new technologies which both enabled new forms of copyright protection as well as new forms of copyright infringement." *IQ Group,* 409 F.Supp.2d at 597. The Court also agrees in general with the *IQ Group* court's reasoning that:

> [A narrower] interpretation of § 1202 makes sense ... because it fits § 1201 with § 1202, and with chapter 12 [of the DMCA] as a whole. The language of § 1201 expressly states that it concerns the circumvention of a "technological measure" which either "effectively controls access to a work" or "effectively protects a right of a copyright

---

**16.** For example, there are no facts establishing that the copyright information on FEATHERS included a bar code or other marker that could be electronically scanned; nor are there any facts showing that defendants scanned or otherwise transferred the FEATHERS design into digital form so that the design could be disseminated electronically.

**17.** Interpreting the phrase "including in digital form" to mean that copyright management information exists wherever copyright information is located (*i.e.,* on all non-digital works, such as fabric, as well as digital works), would in effect result in the DMCA replacing existing copyright law, as the Act would theoretically apply to *all* instances of copyright infringement where copyright information was falsified, altered or removed as set forth in subdivisions (a) and (b) of § 1202. Considering the historical context of the DMCA, the Court finds that the Act's scope was intended to be more limited, in that its purpose was to give an added layer of protection to certain works that were vulnerable to infringement due to advances in modern technology, namely the Internet and electronic commerce. In reaching this conclusion, the Court recognizes that, although the definition of "copyright management information" is perhaps inartfully worded, § 1202 nevertheless *does* apply to copyright management information set forth on certain non-digital works. The Court is not attempting to define or specify what types of non-digital works are covered. Rather, under the particular facts of this case—that is, *in the absence of any facts demonstrating that a technological process was utilized in connection with either applying the copyright information to the fabric or in removing such information or in subsequently distributing the design*—the Court is not persuaded that the copyright information on the FEATHERS fabric warrants coverage by the DMCA.

owner." These two provisions are sections within a common chapter (chapter 12, "Copyright Protection and Management Systems") and are the two provisions covered by the remedies and penalty provisions of §§ 1203 and 1204. Chapter 12, as a whole, appears to protect automated systems which protect and manage copyrights. The systems themselves are protected by § 1201 and the copyright information used in the functioning of the systems is protected in § 1202.

*IQ Group*, 409 F.Supp.2d at 597.[18]

If the scope of § 1202 were as broad as plaintiff urges, it appears that such an expansive construction would be contrary to the intent of Congress and inconsistent with the statute's legislative history. Accordingly, the Court concludes that, when considering § 1202 within the structure of the DMCA as a whole and in light of its historical context, the statute does not apply here. With respect to the third cause of action, the Court therefore finds no genuine issue as to any material fact and that summary adjudication of this claim is appropriate.

## D. PLAINTIFF'S APPLICATION TO FILE A SUR–REPLY

Plaintiff asserts in the Application that a sur-reply is necessary because defendants changed their arguments "significantly" between their opening brief and reply brief. (Application at 1–4). The Court has reviewed the Application and concludes that a sur-reply is not warranted. With respect to the claim of copyright infringement, defendants' reply brief does not raise new arguments—it merely reiterates and elaborates on the grounds for dismissal asserted in the opening brief. Moreover, as the Court has denied summary adjudication of the first and second causes of action for copyright infringement, the Court finds no need to review plaintiff's requests for admissions propounded to defendants that relate to those claims. As for the DMCA claim, because the Court finds that 17 U.S.C. § 1202 does not apply to the facts of this case, plaintiffs arguments set forth in the sur-reply regarding the merits of that claim are moot. Accordingly, plaintiff's Application is denied.

## V.

### *ORDER*

For the foregoing reasons, IT IS HEREBY ORDERED that defendants' motion for summary judgment is **denied** with respect to the first and second causes of action involving claims of copyright infringement, and **granted** with respect to

**18.** Although the Court is persuaded to some extent by the reasoning set forth in the *IQ Group* decision, the Court does not find it necessary to define the scope of § 1202 as definitively as the *IQ Group* court did (*i.e.*, that the provision applies only to copyright management information that functions "as a component of an automated copyright protection or management system"). *See IQ Group*, 409 F.Supp.2d at 598. The Court also notes the declaration of attorney Lorin Brennan submitted by plaintiff in support of its opposition wherein Mr. Brennan describes his participation in the legislative efforts that led to the enactment of the DMCA and explains the basis for his opinion that "copyright management information" is not limited to information in only "digital" or "electronic" form. The conclusion reached today regarding the limits of § 1202 is not necessarily at odds with Mr. Brennan's opinion. Although Mr. Brennan opines that "copyright management information" may exist in non-digital or non-electronic form, he does not go so far as to state that § 1202 extends to a copyright notice that is set forth on fabric selvage or a tag, and that can be physically removed.

the third cause of action alleging a violation of 17 U.S.C. § 1202.